148 F.3d 101
 UNITED STATES of America, Appellee,
v.
Luis FELIPE, also known as King Blood, also known as Inka,
and Zulma Andino, also known as Queen Zulma,
Defendants-Appellants,
Jose Melendez, also known as King Epic; Jose Gabriel, also
known as King Teardrop; Jose Cruz, also known as King
Blaze; Francisco Soto, also known as King Assassin; Samuel
Santiago, also known as King Sammy; Michael Antonio
Sanchez, also known as King Bishop; Milton Soto, also known
as King Tee; Luis Toledo, also known as King Zer; Mario
Quinones, also known as King Bosco; Nelson Torres, also
known as King Nell; Michael Irizarry, also known as King
Riot; Raymond Maldonado, also known as King Chino; Carmelo
Garcia, also known as King Mello; Reynaldo Perez, also
known as King Lil Rey; Jose Torres, also known as King
Chino; Ali Fares, also known as King Tattoo; Elquiades
Morales, also known as King Apollo; Fidel Ayala-Mercado,
also known as King Ito; Ulysses Campos, also known as King
Puti; Felix Cordero, also known as King Bear; Daniel
Navarro, also known as King Scarface; Gilberto Rivera, also
known as King Cano; Richard Rivera, also known as King
Oreo; Wilson Cortez, also known as King Chino; Carlos
Donis, also known as King Mousey; Angel Feliciano, also
known as King Angel, also known as King A; Alberto
Figueroa, also known as King Drac; Francisco Torres, also
known as King Bollo; Roberto Puente, also known as King
Manole; Michael Gonzalez, also known as King Wolfie;
Antonio Delestre, also known as King Tome; Sammy Fonseca,
also known as King Green Eyes and Richard Acevedo, also
known as King Richie, Defendants.
UNITED STATES of America, Appellee,
v.
Jose Manual MELENDEZ, aka "King Epic"; Jose Gabriel, aka
"King Teardrop"; Jose Gabriel Cruz, aka "King Blaze";
Francisco Sot,, aka "King Assassin"; Samuel Santiago, aka
"King Sammy"; Michael Antonio Sanchez, aka "King Bishop";
Milton Soto, aka "King Tee"; Luis Toledo, aka "King Zer";
Mario Quinones, aka "King Bosco"; Nelson Torres, aka "King
Nell"; Michael Irizarry, aka "King Riot"; Raymond
Maldonado, aka "King Chino"; Carmelo Garcia, aka "King
Mello"; Reynaldo Perez, aka "King Lil Rey"; Jose Torres,
aka "King Chino"; Ali Fares, aka "King Tattoo"; Elquiades
Morales, aka "King Apollo"; Fidel Ayala-Mercado, aka "King
Ito"; Zulma Andino, aka "Queen Zulma"; Ulysses Campos, aka
"King Puti"; Felix Cordero, aka "King Bear"; Daniel
Navarro, aka "King Scarface"; Gilberto Rivera, aka "King
Cano"; Richard Rivera, aka "King Oreo"; Wilson Cortez, aka
"King Chino"; Carlos Donis, aka "King Mousey"; Angel
Feliciano, aka "King Angel", aka "King A"; Alberto
Figueroa, aka "King Drac"; Francisco Torres, aka "King
Bollo"; Roberto Puente, aka "King Manole"; Michael
Gonzalez, aka "King Wolfie"; Antonio Delestre, aka "King
Tone"; Sammy Fonseca, aka "King Green Eyes"; Richard
Acevedo, aka "King Richie"; LNUl-94CR035-036, aka "King
Julio", Defendants,
Luis Felipe, aka "King Blood", aka "Inka", Defendant-Appellant.
 Docket Nos. 97-1155, 97-1186 and 97-1484.
 United States Court of Appeals, Second Circuit.
 Argued Jan. 22, 1998.
 Decided June 19, 1998.
 
 Lawrence K. Feitell, New York City, for Defendant-Appellant Luis Felipe.
 Martin J. Siegel, New York City, for Defendant-Appellant Zulma Andino.
 Alexandra A.E. Shapiro, Assistant United States Attorney, New York City (Mary Jo White, United States Attorney, Robert E. Rice, Craig A. Stewart, Assistant United States Attorneys for the Southern District of New York, New York City, of counsel), for Appellee United States of America.
 Before CARDAMONE, McLAUGHLIN, Circuit Judges, and CONNER,* District Judge.
 CARDAMONE, Circuit Judge.
 
 
 1
 Luis Felipe appeals from a judgment of conviction entered against him on March 25, 1997 in the United States District Court for the Southern District of New York (Martin, J.), as well as from two orders entered in the same court. One, an April 30, 1997 order, denied his motion to modify his sentence; the other, entered August 14, 1997, denied defendant's request to expand his rights to communicate with others outside prison. Zulma Andino appeals from the judgment of conviction and accompanying sentencing order entered March 14, 1997 in the United States District Court for the Southern District of New York, also before Judge John S. Martin.
 
 
 2
 Felipe and Andino were members of two affiliated Hispanic organizations, the Latin Kings and Latin Queens. During the period of time in which they were the organizations' leaders, they directed the commission of numerous violent and illegal acts. After they and 16 co-defendants were indicted on 68 counts for crimes committed by members of the Latin Kings and Queens, Felipe stood trial and was convicted on all 18 counts alleged against him. He received life imprisonment, plus a consecutive sentence of 45 years, together with restricted rights of association and communication. Andino pled guilty to three counts and was sentenced to 18 years' imprisonment. We will discuss each defendant's appeal in turn.
 
 Luis Felipe
 
 3
 Although Felipe filed two separate appeals from the three orders, one challenging his conviction and the conditions on his confinement (97-1155(L)), and the other challenging the district court's refusal to modify those conditions (97-1484), we respond to both appeals in one opinion because a number of issues raised in each are similar. The principal issue is the severe restrictions on Felipe's First Amendment rights to communicate. The restrictions imposed are extreme, but so are the circumstances that brought them about. The prisoner whose conviction we review is a cold-blooded murderer whose depraved and vicious predilections were not restrained by the fact of his imprisonment. In the present absence of a reason to impose restrictions less severe, there are only few choices available to the sentencing court, and they are poor ones at best. Yet, because we think that the district court took the best of these choices, we affirm.
 
 BACKGROUND
 A. Leader of the Latin Kings
 
 4
 In 1986 Luis Felipe, a/k/a "King Blood," founded and became the self-appointed leader of the New York State Chapter of the Latin Kings, an organization which, according to defendant, was designed to "promote a sense of Hispanic identity among prison inmates" and to organize Caribbean Hispanics serving jail sentences. The aim of the organization was ostensibly to protect Hispanics from ethnic discrimination at the hands of other inmate organizations and hostile prison authorities. Subsequently, a civilian component was formed under Felipe's leadership, often consisting of former inmates. The government describes the Latin Kings in less benign terms as a racketeering enterprise whose members and associates engage in acts of violence, armed robbery, narcotics trafficking, and murder. The Latin Kings have a sister organization for women called the Latin Queens, and the two groups together are known as the "Almighty Latin Kings and Queens Nation."
 
 
 5
 At all times, Felipe participated in the Latin Kings' activities from his jail cell, first at the Collins Correctional Facility in Helmuth, New York--where he was serving a nine-year sentence for second degree manslaughter arising from the death of a woman in 1981--and later, after May 1993, at the Attica Correctional Facility in Attica, New York, to which he had been transferred. His leadership of the organization was maintained by corresponding with, receiving visits from, and sending "written directives" to various members.
 
 
 6
 In early April 1993 while Felipe was incarcerated at Collins, New York State Department of Correctional Services (DOC) officials learned that he had violated prison regulations by attempting to "kite," i.e., send through a third party, letters to an inmate at another facility with whom he was not authorized to correspond. From the letters, officials learned that Felipe was the leader of the Latin Kings--an organization they deemed an unauthorized prison gang--and, as such, was actively recruiting more members into the organization. From the correspondence, authorities also became aware of the fact that the Latin Kings were planning illegal acts. For example, one letter promised to send an inmate a Latin Kings manifesto through his mother, and further stated that an unidentified person whom Felipe believed had betrayed the Latin Kings "deserve[d] to die." Later that month, Felipe did try to send a copy of the manifesto to an inmate, which DOC officials intercepted.
 
 
 7
 As a result of these violations of prison regulations, Felipe was transferred from Collins to Attica, a maximum security prison. In addition, as a result of his activities and the DOC's knowledge that he was the leader of the Latin Kings, he was adjudged a prison security threat. The Department thereafter requested a "mail watch" on him pursuant to New York State's regulations governing correspondence by inmates incarcerated in state correctional facilities. Those regulations allow a prison superintendent to authorize the inspection of outgoing and incoming mail if there is reason to believe that the correspondence threatens the safety of any person or the good order of the facility. See Inmate Correspondence Program, DOC Directive No. 4422 (1993). Authorization for the mail watch was renewed every 60 days while Felipe was incarcerated at Attica.
 
 B. Indictment on 18 Counts
 
 8
 The letters and correspondence intercepted by DOC officials established defendant's plans to murder and contained directives to carry out the homicides of six individuals: William Cartegena, Ismael Rios, Rafael Gonzalez, Margie Carderon, Ronnie Gonzalez, and Pedro Rosario. On June 21, 1994 Felipe was arrested on charges of racketeering activity that included murder, attempted murder, and conspiracy to murder in violation of 18 U.S.C. §§ 1959(a)(1) and (5). He was later indicted on 18 counts for his participation in seven racketeering acts, which are set forth briefly below.
 
 C. The Seven Acts of Racketeering
 
 9
 (1, 2) The Attempted Murder of Rafael Gonzalez and the
 
 Murder of Victor Hirschman
 
 10
 In May 1993 Felipe began to view fellow Latin King Rafael Gonzalez, a/k/a "King Mousey," as a threat to his leadership and therefore enlisted William Cartegena, a/k/a "King Lil Man," a friend and subordinate leader of the Kings, to kill him. When Cartegena proved unsuccessful at killing Gonzalez, Felipe enlisted three other Latin Kings to commit the murder. On October 30, 1993 those three individuals selected five other Kings to carry out Felipe's assassination order. The five Kings went to a building where Gonzalez was supposed to be, and there shot and killed Gonzalez's brother-in-law, Victor Hirschman. They fired shots at Gonzalez too, and although they seriously wounded him, they did not succeed in killing him.
 
 
 11
 (3, 4) The Murder of William Cartegena and the Attempted
 
 Murder of Margie Carderon
 
 12
 Unhappy with Cartegena due to his failure to murder Gonzalez, and also because he believed Cartegena had stolen money from the Latin Kings' treasury, Felipe enlisted Jose Gabriel, a/k/a "King Teardrop," in July 1993 to strip Cartegena of his leadership position and have him murdered. Felipe also ordered the murder of Cartegena's girlfriend, Margie Carderon, a/k/a "Queen Margie," because he believed she knew too much about the organization's criminal activities. In September 1993 Cartegena was choked to death by several Latin Kings who thereafter dismembered him and removed his Latin Kings' tatoo from his body. Later that same month, after the Kings who were selected to murder Margie Carderon proved unable to shoot and kill her, they decided to burn the apartment building where she lived. Although Carderon escaped the fire, two of her neighbors suffered severe burns in the course of the conflagration.
 
 
 13
 (5, 6) The Murder of Ismael Rios and the Attempted Murder of
 
 Ronnie Gonzalez
 
 14
 Next, Felipe ordered the murders of Ismael Rios, a/k/a "King J.R.," and Ronnie Gonzalez, a/k/a "King Ronnie," in September 1993, after they refused to follow the orders of, and aligned themselves in competition with, Gabriel. The orders were carried out in January 1994, after Felipe deceived Rios and Gonzalez into believing that their dispute with him was at an end. Latin Kings gunned down Rios and attempted to kill Gonzalez, who ran away and escaped unharmed.
 
 
 15
 (7) The Conspiracy to Murder Pedro Rosario
 
 
 16
 Pedro Rosario, a/k/a "Pete Rock," an inmate at Riker's Island Correctional Facility, was considered an enemy of the Latin Kings because he had slashed several of that organization's members who were incarcerated with him. Felipe gave the "green light" to Latin Kings at Riker's to assassinate Rosario in early 1994. After Rosario was slashed at Riker's, however, the Latin Kings' leader at that facility, Jose Cruz, a/k/a "King Blaze," issued an order taking the green light off of Rosario. Felipe overruled the order and wrote in a letter that Rosario must be terminated because he had attacked Latin Kings and "[w]ho ever try to challenge our Nation in any kind of way or fashion must feel the Almighty Wrath."
 
 D. The Proceedings Below
 
 17
 The proof establishing Felipe's role in the Latin Kings and his participation in the murders and other violent crimes described above was provided by, among others, testimony from two of Felipe's accomplices, one of Felipe's execution targets (Margie Carderon), law enforcement officers who had investigated the crimes, forensic experts, and more than 60 letters written by or to Felipe while he was incarcerated at Attica. After his five-week trial concluded on November 19, 1996, Felipe was convicted on all 18 counts against him.
 
 
 18
 On February 14, 1997 Judge Martin sentenced Felipe to life imprisonment. In addition, the district court imposed "special conditions of confinement," requiring that Felipe: (1) be confined in special housing, i.e., solitary confinement, without contact with other prisoners; (2) be prohibited from communicating with any co-defendants or any member of the Latin Kings or Queens; (3) be prohibited from corresponding with, and receiving visits from, anyone except his attorney and close family members approved by the district court with notice to the U.S. Attorney's office, and that correspondence and visits with everyone except his attorney be monitored; and (4) be prohibited from telephone contact with anyone, later modified to permit Felipe to make calls to his attorney.
 
 
 19
 In imposing these conditions upon Felipe's confinement, the district court judge stated that the case presented unusual circumstances and raised unique concerns because defendant, while in prison, had used his privileges to correspond with people outside the prison in order to maintain control over the criminal activities of the Latin Kings and cause the murders of a number of people. Because there was every reason to believe Felipe would abuse those privileges again and attempt to orchestrate additional murders, Judge Martin determined that his human contacts needed to be severely restricted.
 
 
 20
 On March 7, 1997 Felipe moved for an order to vacate and set aside the sentence pursuant to Federal Rule of Criminal Procedure 35, and be re-sentenced without the imposition of the special conditions of confinement. As a result of oral argument on the motion, the district court ruled that the defendant could communicate with a sister-in-law, niece, and an attorney who had served as a paralegal on Felipe's case and developed a close relationship with him. The sentencing court otherwise denied the motion to vacate the special conditions in an order entered April 30, 1997, stating that the special conditions were imposed, not to punish Felipe, but to protect other individuals who, given Felipe's history, could become his targets in the future.
 
 
 21
 On August 5, 1997 Felipe again applied for an amendment of the order imposing special conditions. This time, Felipe requested permission to: (1) submit art work and poetry to magazines offering contests; (2) write agencies supporting prisoners' rights; (3) correspond with "church people" offering "spiritual advice;" and (4) correspond with people who were not members of the Latin Kings organization. This application was denied for the same reasons the district court had articulated at sentencing and in its April 1997 opinion denying Felipe's Rule 35 application, namely that Felipe could use his writing privileges to induce outsiders to commit crimes. From his conviction and the orders denying his motions to modify the conditions imposed on his incarceration, Felipe appeals.
 
 DISCUSSION
 
 22
 I Refusal to Suppress Prison Correspondence
 
 
 23
 We turn now to an analysis of the issues raised on these appeals. Before his trial commenced, Felipe attempted to suppress his Attica correspondence, arguing that the interception of his mail violated his First and Fourth Amendment rights, in addition to New York State and federal postal regulations. The district court rejected this contention and, as noted above, the correspondence was used to convict defendant. On appeal, Felipe asserts that the district court's failure to suppress the correspondence was such error as to entitle him to a new trial.
 
 
 24
 Upon entering into confinement, it must be recognized that a prisoner's constitutional rights are limited by the legitimate penological needs of the prison system. But, as the Supreme Court teaches, "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." Bell v. Wolfish, 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Thus, it may truly be said that prison walls are not a barrier between a prisoner and protections guaranteed him under the Constitution. See Thornburgh v. Abbott, 490 U.S. 401, 407, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). Prisoners may petition the government for redress of their grievances, are protected against invidious racial discrimination, and are entitled to due process. See Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Federal courts must uphold a prisoner's exercise of these rights, while also according deference to legislative and executive branch policies designed to address the urgent problems involved in administering a modern-day prison. See id. at 84-85, 107 S.Ct. 2254. It is plain therefore that an inmate retains those First Amendment rights that do not contravene prison regulations "reasonably related to legitimate penological interests." Id. at 89, 107 S.Ct. 2254.
 
 
 25
 Applying the principles of Turner and other relevant Supreme Court cases, we have ruled that the interception of a defendant's prison correspondence does not violate that individual's First or Fourth Amendment rights if prison officials had "good" or "reasonable" cause to inspect the mail. See United States v. Workman, 80 F.3d 688, 699 (2d Cir.1996) ("We think it clear that--at least where prison officials have reasonable cause for suspicion--surveillance of inmate mail is unobjectionable under the [First and] Fourth Amendment[s]."), cert. denied, --- U.S. ----, 117 S.Ct. 319, 136 L.Ed.2d 233 (1996) and cert. denied, --- U.S. ----, 117 S.Ct. 373, 136 L.Ed.2d 262 (1996). Reasonable cause in Workman was based on overheard telephone conversations during which the defendant conducted drug transactions and discussed the commission of contract murders. In upholding the officials' actions, we said that the investigation and prevention of illegal activity among inmates is a legitimate penological interest, which has a logical connection to the decision to impose a mail watch on a prisoner. See id. In the case at hand, given the DOC's knowledge that Felipe was the leader of the Latin Kings, was actively recruiting new members, had violated prison regulations related to mail, and had written about the commission of illegal acts, such facts constituted reasonable cause to intercept defendant's correspondence.
 
 
 26
 Felipe insists that suppression was nevertheless warranted in this case because the DOC failed to comply with its own regulations, which require that authorization for inspection of an inmate's outgoing mail "set forth specific facts forming the basis for the action." Inmate Correspondence Program, DOC Directive No. 4422, at 2. But, a technical violation of this particular regulation does not require suppression of information gleaned from a mail watch. See Workman, 80 F.3d at 699 n. 7 ("Where, as here, there is sufficient basis for the decision to institute a mail watch, the Constitution does not in our view require suppression of the evidence gathered during the surveillance merely because the relevant supervising official, when approving the mail watch, failed to restate in writing the facts underlying the decision."). Having found a sufficient basis for the DOC's actions in this case, we follow our approach in Workman and hold that the DOC's failure to set forth specific facts in its orders was simply a technical violation insufficient to warrant suppression of Felipe's correspondence.
 
 
 27
 Nor are we persuaded by his argument that the DOC could not have formulated "good cause" to intercept his mail for over a year since officials allegedly did not read his letters for content, but simply copied and sent them to a warehouse in Albany. While Felipe provides no support for his assertions, the government points to affidavits in the record establishing that DOC officials in Albany did review the mail on a regular basis, and that authorization for the 60-day renewals was based on information gathered from this investigatory reading, in addition to other sources, apprising the DOC that the defendant appeared to be involved in illegal activities that threatened the security of the prison.
 
 
 28
 Defendant's point regarding the United States Postal Service regulations also fails to provide him with a remedy. While appellant correctly points out that the Postal Service under normal circumstances is the only agency legally permitted to maintain a postal cover, see Postal Service Regulations, 39 C.F.R. § 233.3(a) (1997), an exception exists for correctional facilities. The Postal Service's Operations Manual expressly states that mail addressed to inmates "is delivered to the institution authorities who, in turn, deliver the mail to the addressee under the institution's rules and regulations." Postal Operations Manual § 615.1 (1996); see also 39 C.F.R. § 211.2(a)(2) (1997) (incorporating the Postal Operations Manual into the Code of Federal Regulations); Bureau of Prisons Regulations, 28 C.F.R. § 540.14 (1997) (requiring prison staff to open and inspect all incoming general correspondence and allowing staff to read outgoing correspondence of inmates in federal medium and high level security institutions). Hence, the Postal Service regulation regarding mail covers is irrelevant in appellant's case, and the DOC was justified in monitoring his mail.
 
 
 29
 Further, even if the DOC had violated the Postal Service's regulations regarding mail covers, Felipe still would not be entitled to the suppression of his letters because suppression is not an available remedy for violations of agency regulations that fail to raise constitutional questions. See United States v. Caceres, 440 U.S. 741, 755-57, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979) (holding that evidence obtained in violation of Internal Revenue Service regulations was admissible at the criminal trial of a taxpayer accused of bribing a Service agent); United States v. Ani, 138 F.3d 390, 392 (9th Cir.1998) ("Absent a constitutional violation or a congressionally created remedy, violation of an agency regulation does not require suppression of evidence."). In sum, it was not error to admit Felipe's prison correspondence into evidence during his trial.
 
 II Special Conditions of Confinement
 
 30
 Felipe next challenges the special conditions regarding his confinement imposed as part of his sentence. He maintains that the district court had no authority to impose such stringent conditions, which he declares also violate his rights under the Constitution.
 
 A. Authority to Impose Conditions
 
 31
 The conditions of a prisoner's confinement are normally determined by the Attorney General through the Bureau of Prisons. See, e.g., 18 U.S.C. § 3621 (1994) (describing the Bureau of Prison's role with respect to the imprisonment of a convicted person); 18 U.S.C. § 4001(b) (1994) (vesting control and management of federal prisons to the Attorney General); 18 U.S.C. § 4042 (1994) (authorizing Bureau of Prisons, under direction of the Attorney General, to manage and regulate federal prisons and the inmates within). Yet, we have also ruled that where there is specific statutory authority, a sentencing court may impose conditions on a prisoner's confinement. See United States v. Huss, 520 F.2d 598, 602 (2d Cir.1975).
 
 
 32
 In the case at hand, authority derives from 18 U.S.C. § 3582(d), which allows district courts to limit the associational rights of defendants convicted of racketeering offenses. Section 3582(d) provides that a court,
 
 
 33
 in imposing a sentence to a term of imprisonment upon a defendant convicted of a felony set forth in chapter 95 (racketeering) or 96 (racketeer influenced and corrupt organizations) of this title, ... may include as a part of the sentence an order that requires that the defendant not associate or communicate with a specified person, other than his attorney, upon a showing of probable cause to believe that association or communication with such person is for the purpose of enabling the defendant to control, manage, direct, finance, or otherwise participate in an illegal enterprise.
 
 
 34
 18 U.S.C. § 3582(d) (1994); cf. United States v. Sotelo, 94 F.3d 1037, 1040 (7th Cir.1996) (holding that while no federal statute authorizes a court to restrict the communications of an inmate convicted of mailing threatening communications, 18 U.S.C. § 3582(d) does authorize a district court to restrict the communications of an inmate convicted of racketeering offenses).
 
 
 35
 Here, Felipe was convicted of participating in racketeering activities as the leader of the Latin Kings while incarcerated at Attica. There was also the requisite showing of probable cause, in that the record evidenced Felipe's skill at circumventing prison regulations and using secret codes to control the Latin Kings organization and orchestrate numerous murders. Judge Martin properly concluded that Felipe could again use his powers of association and communication to direct other members to carry out violent crimes in the name of the organization. Hence, he had authority to impose relevant conditions of confinement.
 
 
 36
 Appellant's stronger argument points out that the district court's order fails to identify "a specified person" with whom Felipe may not communicate, as required by § 3582(d), but rather forbids communication with everyone but close family members. While we acknowledge that the language of the statute is not broad, the trial court's order, in our view, does not fall outside it. We do not believe Congress expected sentencing courts to list every individual of a racketeering organization in cases where sufficient reason exists to believe that association with any member is for the purpose of participating in an illegal enterprise. Racketeering groups are often large and boast a constantly changing membership. It would be difficult, if not virtually impossible, to identify each and every active member of such an organization. The purpose of § 3582(d) "is to prevent the defendant from continuing his illegal activities from his place of confinement." S.Rep. No. 98-225, at 121 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3304. The conditions imposed upon Felipe were reasonably formulated to accomplish that objective.
 
 
 37
 B. Conditions Do Not Violate Defendant's Constitutional Rights
 
 
 38
 We come finally to the crux of Felipe's appeal: whether the conditions imposed violate his constitutional rights. We find they do not. As already discussed, restrictions "reasonably related to legitimate penological interests" do not violate a prisoner's rights. Turner, 482 U.S. at 89, 107 S.Ct. 2254. Concededly, the Turner analysis is normally applied by a district court when it reviews restrictions imposed by the Bureau of Prisons. To our minds, that analysis is equally applicable where we review the restrictions imposed by a district court.
 
 
 39
 Whether an asserted regulation meets the "reasonableness" test under Turner depends on a consideration of whether: (1) a "valid, rational connection" exists between the regulation and the purported governmental interest; (2) alternative means of exercising a constitutional right remain available to a prisoner; (3) the accommodation of the right will have a significant impact on the prisoner's fellow inmates, prison staff or prison resources; and (4) ready alternatives to the regulation exist that would not impinge on the prisoner's rights. See id. at 89-90, 107 S.Ct. 2254; see also Giano v. Senkowski, 54 F.3d 1050, 1053-56 (2d Cir.1995) (applying Turner test to uphold prison policy of banning sexually explicit photographs of inmates' wives and girlfriends).
 
 
 40
 We believe the Turner test has been met here. First, the goal of preventing Felipe from ordering the killings and beatings of additional individuals, within the prison system or outside, is unquestionably a legitimate penological interest. See Thornburgh, 490 U.S. at 415, 109 S.Ct. 1874 (stating that the legitimacy of the goal of protecting prison security is "beyond question"). Moreover, the restrictions on Felipe's ability to communicate--which is how he directed criminal activity while at Attica--are reasonably related to that legitimate goal. See Bureau of Prison Regulations, 28 C.F.R. § 501.3(a) ("[S]pecial administrative measures ordinarily may include housing the inmate in administrative detention and/or limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone, as is reasonably necessary to protect persons against the risks of acts of violence or terrorism.").
 
 
 41
 While acknowledging that the restrictions on Felipe's ability to associate and communicate are severe, we think such severity necessary under the circumstances to ensure the safety of potential targets whom he may select. Appellant has shown himself to be resourceful in the past; it cannot now be definitely determined that he will refrain from using apparently "innocent" privileges--e.g., sending a picture to a magazine art contest--to order the commission of a violent act, with or without the recipient's awareness.
 
 
 42
 Second, with respect to defendant prisoner having alternative means of communicating and associating with others, we note that he retains the right to communicate with prison employees (including pastoral, medical, and educational department staff), his attorney, and five individuals currently listed on his approved correspondence list. He also retains the right to, and in fact does, receive periodicals. Thus, appellant remains able to exercise his First Amendment rights, though in a limited manner. See Thornburgh, 490 U.S. at 417-18, 109 S.Ct. 1874 ("The Court in Turner did not require that prisoners be afforded other means of communicating with inmates at other institutions.... Rather, it held ... it was sufficient if other means of expression ... remained available.").
 
 
 43
 Third, allowing Felipe unfettered, or even a less severely limited, ability to communicate with other prisoners and the outside world, could significantly impact not only his fellow inmates, but also individuals living outside prison. From his jail cell, Felipe committed the very crimes for which he is now serving a life sentence. And, until shown differently, we agree with the district court's observation that, given the opportunity, appellant would likely continue such illegal activity.
 
 
 44
 Fourth, at least at this time, there are no readily available alternative means of protecting people from appellant's wrath. See Turner, 482 U.S. at 90, 107 S.Ct. 2254 ("[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation."). The purpose of this factor is to ensure that a prisoner's rights are infringed upon to the least possible degree, without compromising the asserted goal of restricting him. See id. at 90-91, 107 S.Ct. 2254. Were less restrictive alternatives available in this case, the district court would have applied them. Felipe's example of such an alternative--allowing correspondence to be exchanged after it is reviewed by the U.S. Attorney's Office--ignores the fact that Felipe could easily slip a secret message past those in charge of monitoring his mail. He did it successfully before. Moreover, even the Supreme Court has acknowledged what a difficult task it would be for prison officials to monitor inmate correspondence, and has dismissed this kind of option as a viable alternative. See id. at 93, 107 S.Ct. 2254 (holding that the prohibition of inmate-to-inmate correspondence was not an unconstitutional infringement of prisoners' First Amendment rights). As Judge Martin said in placing the restrictions on Felipe's ability to communicate with others: "this case presents unusual circumstances and raises unique concerns." Those circumstances and concerns justify the severity of the restrictions.
 
 
 45
 We are further persuaded that the conditions imposed on defendant's confinement are appropriate by the fact that the same district judge has retained jurisdiction over Felipe's case to consider either his or Bureau of Prisons' applications to modify the conditions on the basis of any change of circumstances or for any other just cause. The district court has already modified the order in favor of Felipe on at least two occasions. If, over time, it appears that Felipe no longer poses such a threat to society, various privileges may gradually be restored.
 
 
 46
 In ruling on the last argument appellant raises, we conclude that he was not improperly denied notice and an opportunity for a "plenary" hearing on the imposition of his special conditions of confinement. The trial court did not need to conduct a hearing because its decisions were based on evidence established at Felipe's trial, over which the district judge presided. Moreover, defendant had the opportunity to be heard on the issue at sentencing, at which time he and his counsel strenuously objected. In addition, he filed the Rule 35 motion, upon which the court ruled only after full briefing and oral argument.
 
 
 47
 We emphasize finally that the restrictions imposed upon Felipe's ability to communicate while serving at least the initial part of his life sentence appear appropriate to us based on the singular and brutal facts revealed by this record. Felipe ordered the murders of at least six individuals from his jail cell, two of which were carried out successfully, the others of which led to serious injury to the intended targets, or injury and death to unfortunate bystanders. As a consequence, the fact that he will be in prison for life is no guarantee that his days of committing violent acts towards others are over. At this time, the risk is too high that defendant will order additional killings in the future if severe restrictions are not imposed on his ability to communicate with third parties.
 
 Zulma Andino
 BACKGROUND
 
 48
 Andino, a/k/a "Queen Zulma," was indicted with Luis Felipe and other Latin Kings. She became the leader of the Latin Queens in late 1993. In that role, she was indicted for participating in the commission of at least two crimes. The first was the murder of Islander Navaez, a/k/a "King Lex." Andino confirmed that a termination-on-sight order had been issued by defendant Felipe against Navaez and directed another Latin King to murder Navaez at a location where she knew he would be. The order was carried out and Navaez was shot to death in December 1993.
 
 
 49
 The second was the beating of Annette Martinez. Andino ordered a beating-on-sight after she learned Martinez was falsely claiming to be a high-ranking leader of the Latin Queens. A group of Latin Queens and Kings, including Andino, carried out the order on May 7, 1994, causing Martinez serious injuries.
 
 
 50
 Although Andino was also indicted for her alleged participation in several other crimes, including murder and conspiracy to distribute drugs, she pled guilty on October 10, 1996, only to conspiracy to murder Navaez, conspiracy to assault Martinez, and using and carrying firearms in relation to the murder of Navaez. The charges carried a maximum sentence of 18 years' imprisonment.
 
 
 51
 Defendant entered into a plea agreement with the government to avoid trial. Her agreement included a stipulation that her sentencing range under the Guidelines was 360 months to life imprisonment, plus a five-year consecutive sentence. However, the statutory maximum term of incarceration for her offenses was 18 years, computed as follows: (1) a maximum of 10 years for conspiracy to murder, see 18 U.S.C. § 1959(a)(5) (1994); (2) a maximum of three years for conspiracy to assault, see 18 U.S.C. § 1959(a)(6) (1994); and (3) a maximum of five years for carrying firearms, see 18 U.S.C. § 924(c) (1994). The plea agreement therefore stated that her stipulated Guidelines sentence was 18 years' imprisonment.
 
 
 52
 At her sentencing on March 7, 1997, Andino moved for a downward departure pursuant to U.S.S.G. § 5H1.4, asserting that she had health problems related to epilepsy, asthma, and liver ailments, as well as psychological problems due to a difficult background. The district court refused to grant the downward departure given the offenses to which Andino had pled guilty and, as provided for by statute, sentenced her to 18 years' imprisonment.
 
 DISCUSSION
 
 53
 On appeal, Andino raises two arguments. First, she claims that the sentencing court was not authorized to impose consecutive sentences for the three offenses to which she pled guilty. Her argument is that the use of a firearm during the conspiracy to murder Navaez cannot be "linked" to the assault on Martinez because the two events occurred almost five months apart. Thus, she reasons, the sentences based on those acts cannot run consecutively.
 
 
 54
 This argument is without merit. To begin with, Andino waived her right to appeal her 18-year sentence in her plea agreement. See United States v. Maher, 108 F.3d 1513, 1531 (2d Cir.1997) ("In no circumstance ... may a defendant, who has secured the benefits of a plea agreement and knowingly and voluntarily waived the right to appeal a certain sentence, then appeal the merits of a sentence conforming to the agreement.") (alteration in original) (quoting United States v. Salcido-Contreras, 990 F.2d 51, 53 (2d Cir.1993) (per curiam)). We would therefore be justified in ending analysis here.
 
 
 55
 Yet we take note that the district court was required under U.S.S.G. § 5G1.2 to impose consecutive sentences. Section 5G1.2(d) states that "[i]f the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, ... to the extent necessary to produce a combined sentence equal to the total punishment." The "total punishment" is the sentence, computed by the district court, derived from the correlation between the defendant's combined offense level and the appropriate criminal history category, taking into account the facts and circumstances of the individual's case. See United States v. Loeb, 45 F.3d 719, 723 (2d Cir.1995).
 
 
 56
 In this case, the total of the combined statutory maximums--18 years--was less than the minimum of the Guidelines range to which Andino stipulated in her plea agreement and within which the "total punishment" would have fallen absent the statutory ceiling. The sentencing court was thereby required to impose consecutive sentences on each of the three counts to which she pled guilty. See, e.g., Loeb, 45 F.3d at 723 (affirming the district court's sentence of 60 months on one count and 11 months on another, to be served consecutively, where the maximum statutory sentence for each count was 60 months but the total punishment was 71 months); United States v. Uccio, 917 F.2d 80, 85 (2d Cir.1990) ("Because the guideline range based on the court's findings was 63 to 78 months, more than the statutory maximum for either count, the Guidelines required that the district court impose consecutive sentences to the extent necessary to reach the selected sentence within the guideline range.").
 
 
 57
 Andino's second argument challenges the district court's refusal to grant her motion for a downward departure. This challenge is also without avail as we have repeatedly held that a sentencing court's decision not to grant a downward departure is an exercise of discretion not ordinarily reviewable on appeal unless the district court committed an error of law or was unaware of the power to depart. See United States v. Fernandez, 127 F.3d 277, 282 (2d Cir.1997). Because Andino does not suggest that the district court misapplied the Guidelines, misunderstood its authority to depart, or imposed an illegal sentence, see United States v. Haynes, 985 F.2d 65, 68 (2d Cir.1993), she is entitled to no relief.
 
 CONCLUSION
 
 58
 For the foregoing reasons, we affirm the judgment of convictions entered in the district court in the cases of both Luis Felipe and Zulma Andino, and we affirm also the special conditions imposed on Felipe as part of his sentence.
 
 
 
 *
 Hon. William C. Conner, Senior Judge, United States District Court for the Southern District of New York, sitting by designation