# Regulation of an Inmate's Access to the Media

So long as the Bureau of Prisons' decision to regulate an inmate's access to the news media is reasonably related to the legitimate penological interests articulated in the applicable regulations, the Bureau of Prisons may bar face-to-face media interviews or videotaped media interviews with an inmate, or place other reasonable conditions and restrictions on such interviews.

April 13, 2001

MEMORANDUM OPINION FOR THE COUNSELOR TO THE ATTORNEY GENERAL

You have asked for our view on the extent to which the Attorney General or the warden of a federal prison may regulate an inmate's right to communicate with the news media. This memorandum records, and elaborates on, oral advice given to you on April 11, 2001.

Two sets of regulations speak directly to regulation of an inmate's contact with the media.[1] The broadest of these provisions is 28 C.F.R. § 501.3(a) (2000), which provides that the Attorney General or the Director of the Bureau of Prisons may authorize the warden of a federal prison "to implement special administrative measures that are reasonably necessary to protect persons against the risk of death or serious bodily injury." Such procedures may be implemented upon the determination that "there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons." *Id*. The procedures may include "limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone, as is reasonably necessary to protect persons against the risk of acts of violence or terrorism." *Id*.

In addition, 28 C.F.R. § 540.62(c) (2000) permits the warden of a prison to suspend all media visits during an institutional emergency and for a reasonable time after the emergency, and 28 C.F.R. § 540.63(g)(4) (2000) permits a warden to deny a request for a media interview of an inmate if "[t]he interview, in the opinion of the Warden, would endanger the health or safety of the interviewer, or

---

[1] Although these regulations specifically address the issue of inmate contact with the news media, we note that wardens of federal prisons also have flexibility, embodied in broader grants of authority, to take action reasonably necessary to protect individuals, and the security, discipline, and good order of the institution. *See, e.g*., 28 C.F.R. § 501.1 (2000) (institutional emergency permits suspension of the operation of the rules of chapter 28); *id*. § 501.2 (special administrative measures to prevent disclosure of classified information permitted); *id*. § 540.12 (flexibility in correspondence procedures required by size, complexity, and security level of institution, the degree of sophistication of the inmates confined and other variables); *id*. § 540.40 (warden may restrict visiting when necessary to ensure the security and good order of the institution); *id*. § 540.100 (in addition to procedures set forth in subpart, inmate telephone use is subject to those limitations that the warden determines are necessary to ensure the security and good order, including discipline, of the institution or to protect the public).

would probably cause serious unrest or disturb the good order of the institution." Similarly, a warden is permitted to "[l]imit the amount of audio, video, and film equipment or number of media personnel entering the institution if the Warden determines that the requested equipment or personnel would create a disruption within the institution." *Id*. § 540.63(h)(4).

The Supreme Court established definitively in *Thornburgh v. Abbott*, 490 U.S. 401, 404 (1989), that prison regulations affecting prisoner's First Amendment rights should be analyzed under the reasonableness standard set out in *Turner v. Safley*, 482 U.S. 78, 89 (1987), and such regulations, therefore, will be found valid as long as they are "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. In fact, in three separate contexts, the Supreme Court has upheld prison regulations that prevented the media from conducting interviews with inmates. *See Houchins v. KQED, Inc*., 438 U.S. 1 (1978) (upholding denial of media requests for a special inspection of facilities and interview of inmates); *Pell v. Procunier*, 417 U.S. 817, 827 (1974) (upholding regulations that limited media selection of particular inmate for interview); *Saxbe v. Washington Post Co*., 417 U.S. 843 (1974) (upholding regulations prohibiting the media from conducting face-to-face interviews with specific inmates).

Moreover, the United States Court of Appeals for the District of Columbia Circuit has held that, to the extent the policy in 28 C.F.R. § 540.62 "may impinge on a prisoner's first amendment rights, it is nevertheless valid as 'reasonably related to legitimate penological interests.'" *Kimberlin v. Quinlan*, 6 F.3d 789, 791-92 n.6 (D.C. Cir. 1993) (quoting *Turner*, 482 U.S. at 89). Analogously, in *Johnson v. Stephan*, 6 F.3d 691, 692 (10th Cir. 1993), the United States Court of Appeals for the Tenth Circuit held that state prison officials were permitted to deny television news personnel access to their prison to conduct a face-to-face interview with the inmate. The prison officials had determined that providing such access would cause a disruption to the orderly operation of the facility. Because there were alternative means for communicating with the media (the inmate was free to communicate through the mail and telephone), the Court held that there was no violation of the inmate's First Amendment rights.[2]

---

[2] Nor does the media itself have any special or enhanced right of access to an inmate. Although the right of the press to gather news and information is protected by the First Amendment, *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972), "the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally," *id*. at 684. In this regard, the Supreme Court has held that the press has "no constitutional right of access to prisons or their inmates beyond that afforded the general public." *Pell*, 417 U.S. at 834.

Further, the analysis employed by the courts to determine the validity of regulating an inmate's access to the media is the same regardless of whether the media is asserting a First Amendment right to have access to the inmate or the inmate is asserting a First Amendment right to have access to the media. *Compare Johnson* (media sought access) *with Kimberlin* (inmate sought access). *See also Thornburgh*, 490 U.S. at 410 n.9 (rejecting any attempt to apply a separate standard for cases implicating the rights of outsiders versus prisoners).

Likewise, when the United States Court of Appeals for the Second Circuit upheld a district court's imposition of conditions on an inmate's sentence that included restrictions on his ability to associate and communicate, the court cited the special administrative measures provision of 28 C.F.R. § 501.3(a) in concluding that these restrictions were reasonably related to a legitimate penological goal. *See United States v. Felipe*, 148 F.3d 101, 110 (2d Cir. 1998) (upholding restrictions based on the fact that goal of preventing inmate from ordering the killings and beatings of additional individuals, within the prison system or outside, is unquestionably a legitimate penological interest); *accord United States v. El-Hage*, 213 F.3d 74, 81 (2d Cir.), *cert. denied*, 531 U.S. 881 (2000) (upholding pretrial restrictions on defendants' communications as being reasonably related to legitimate security concerns).

Therefore, as long as the Bureau of Prisons' decision to regulate an inmate's access to the media is reasonably related to the legitimate penological interests articulated in the regulations, the Bureau of Prisons may bar face-to-face interviews or videotaped interviews with an inmate, or place other reasonable conditions and restrictions on such interviews.[3]

In making the case-by-case determination whether, based on the assertion of a legitimate penological interest, an application of any of these prison regulations impinging on an inmate's constitutional rights is valid, the courts will look to: (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest offered as the basis to justify it; (2) whether there are alternative means of exercising rights that remain open to the inmate; (3) whether accommodation of the prisoner's asserted rights would have a ripple effect on fellow inmates or prison staff; and (4) whether there is a ready alternative to the regulation that would fully accommodate the prisoner's rights at minimal cost to the valid penological interest. *Turner*, 482 U.S. at 89-91. Included in this assessment is whether the regulation is "an 'exaggerated response' to prison concerns." *Id*. at 90. Moreover, in the First Amendment context, the Supreme Court also has stated that "[w]e have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression." *Id*.

In *Pell v. Procunier*, 417 U.S. 817, 826-27 (1974), the Supreme Court explained that:

> The "normal activity" to which a prison is committed—the involuntary confinement and isolation of large numbers of people, some of

---

[3] Even in the context of media access to court proceedings, in which courts have held that the First Amendment protects the rights of the press and the public to observe certain governmental proceedings, *see, e.g., Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) (criminal trials), the courts have upheld restrictions on videotaping, photographing, televising, or recording such proceedings. *E.g., Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 610 (1978) (no right to broadcast trial).

whom have demonstrated a capacity for violence—necessarily requires that considerable attention be devoted to the maintenance of security. Although they would not permit prison officials to prohibit all expression or communication by prison inmates, security considerations are sufficiently paramount in the administration of the prison to justify the imposition of some restrictions on the entry of outsiders into the prison for face-to-face contact with inmates.

The Court has also noted that "prison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison." *Thornburgh*, 490 U.S. at 407. "So long as [a] restriction operates in a neutral fashion, without regard to the content of the expression, it falls within the 'appropriate rules and regulations' to which 'prisoners necessarily are subject,' and does not abridge any First Amendment freedoms retained by prison inmates." *Pell*, 417 U.S. at 828 (quoting *Cruz v. Beto*, 405 U.S. 319, 321 (1972)).

Thus, denial of an interview or of the taping or recording of an interview with an inmate, as long as it is based on legitimate prison security concerns rather than on the content of the speech itself, is permissible. To the extent there is legitimate concern about the effect that an inmate's speech would have on the conduct of others, and the resulting harm that could flow from that effect, 28 C.F.R. § 501.3(a) may be available to assert an even broader restriction on the inmate's communications with the media. The legitimacy of such a restriction, however, would depend on the strength and clarity of the evidence supporting a determination that there is a "substantial risk" that communications will result in "death or serious bodily injury." This determination differs from the penological security concerns associated with "the good order of the institution" and "disruption within the institution" contained in 28 C.F.R. § 540.63. Indeed, to the extent that the determination focuses on effects outside the prison, it is not settled that the courts will give *Turner* deference to the application of the regulation.

DANIEL L. KOFFSKY
*Acting Assistant Attorney General*
*Office of Legal Counsel*