213 F.3d 74 (2nd Cir. 2000)
 UNITED STATES OF AMERICA, Appellee,
v.
WADIH EL-HAGE, also known as Abdus Sabbur, Defendant-Appellant,
FAZUL ABDULLAH MOHAMMED, also known as Harun Fazhl, also known as Fazhl Abdullah, also known as Fazhl Khan, MOHAMED SADEEK ODEH, also known as Abu Moath, also known as Noureldine, also known as Marwan, also known as Hydar, MOHAMED RASHED DAOUD AL-OWHALI, also known as Khalid Salim Saleh Bin Rashed, also known as Abdul Jabbar Ali Abel-Latif, USAMA BIN-LADEN, also known as Usamah Bin-Muhammad Bin-Ladin, also known as Shaykh Usamah Bin-Ladin, also known as Mujahid Shaykh, also known as Hajj, also known as Al Qaqa, also known as Director, MUHAMMAD ATEF, also known as Abu Hafs, also known as Abu Hafs El Masry, also known as Taysir, also known as Aheikh Taysir Abdullah, MUSTAFA MOHAMED FADHIL, also known as Mustafa Ali Elbishy, also known as Hussein, also known as Hassan Ali, KHALFAN KHAMIS MOHAMED, also known as Khalfan Khamis, AHMED KHALFAN GHAILANI, also known as Fupi, also known as Abubakary Khalfan Ghailiani, FAHID MOHAMMED MSALAM, also known as Fahad M. Ally, SHEIKH AHMED SALIM SWEDAN, also known as Sheikh Bahamadi, also known as Ahmed Ally, MAMDOUH MAHMUD SALIM, also known as Abu Hajer al Iraqi, also known as Abu Hajer, ALI MOHAMED, also known as Ali Abdelseoud Mohamed, also known as Abu Omar, also known as Haydara, also known as Taymour Ali Nasser, also known as Ahmed Bahaa Adam, AYMAN AL ZAWAHIRI, also known as Abdel Muaz, also known as Ayman Al Zawahiri, also known as Doctor and KHALED AL FAWWAZ, also known as Abu Omar, also known as Hamad, Defendants.
 Docket No. 00-1025
August Term, 1999
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: March 13, 2000
Decided: May 25, 2000
 
 Defendant Wadih El-Hage appeals from an order of the United States District Court for the Southern District of New York (Sand, J.) that denied his motion to be released on bail, denied his application for modification of the condition of his confinement, and denied his application for an evidentiary hearing.
 Affirmed.[Copyrighted Material Omitted]
 KENNETH M. KARAS, Assistant United States Attorney, New York, New York (Mary Jo White, United States Attorney, Patrick J. Fitzgerald, Michael J. Garcia, Paul W. Butler, Ira M. Feinberg, Baruch Weiss, Assistant United States Attorneys, Southern District of New York, New York, New York, of counsel), for Appellee United States of America.
 JOSHUA L. DRATEL, Joshua L. Dratel, P.C., New York, New York (Sam A. Schmidt, Deborah I. Meyer, Law Offices of Sam A. Schmidt, New York, New York, of counsel), for Defendant-Appellant Wadih El-Hage.
 Before: CARDAMONE, and CABRANES, Circuit Judges, and TRAGER*., District Judge.
 PER CURIAM:
 
 
 1
 Defendant Wadih El-Hage appeals from an order entered orally on January 10, 2000 and by written endorsement January 13, 2000 in the United States District Court for the Southern District of New York (Sand, J.). The order denied defendant's motion to be released on bail, his application for rescission or for substantial modification of the Special Administrative Measures (S.A.M.) of his confinement, and his application for an evidentiary hearing regarding the substance of the motion. On March 13, 2000 this panel heard oral argument on this appeal, and on March 17, 2000 entered an order denying each of the three applications, in effect affirming the order of the district court. We noted in our order that this opinion was to follow in due course.
 
 
 2
 Pretrial detention is authorized by statute. Under 18 U.S.C. §3142(e) a person may be detained before trial if it is found that no condition or combination of conditions of an indicted defendant "will reasonably assure the appearance of the [defendant] . . . and the safety of any other person and the community." Due process limits how long an accused may be detained in prison without a trial. But exactly how long such detention may extend before violating due process limits - the issue we face on this appeal - has not been fixed in the law. The 30-33 months of pretrial detention served or contemplated to be served before the conclusion of a trial in this case is extraordinary, and justified only by the unprecedented scope of violence, that the conspiracy of which defendant was allegedly a part inflicted on innocent victims, by the extraordinarily complex and difficult preparation needed to present this case, and, more particularly, because the lengthy delay in bringing defendant to trial may not be laid at the government's doorstep.
 
 BACKGROUND
 A. Facts
 
 3
 Wadih El-Hage is a 39-year old United States citizen who, until his arrest, resided in Arlington, Texas with his wife and seven children. El-Hage, a native of Lebanon, has lived in the United States for much of the past 22 years, and also has lived in Pakistan, the Sudan, and Kenya with his family during that period. He was arrested on September 16, 1998 and charged with six conspiracies to kill United States citizens and destroy United States property abroad, 20 counts of perjury based on his grand jury testimony, and three counts of false statements. The charges against El-Hage arise from his alleged participation in conspiracies led by co-defendant Usama Bin Laden, who is still at large, to attack United States citizens and interests world-wide.
 
 
 4
 The indictment charges defendant with being a key participant in the terrorist organization founded by Bin Laden, called "al Qaeda" (the Base). The indictment states that Bin Laden and al Qaeda issued a public declaration of war against the American military in August 1996 and, on February 23, 1998, endorsed a statement that Muslims should kill Americans, anywhere they could be found. Count One of the indictment asserts that to achieve these aims, al Qaeda provided its members with military and intelligence training, training in guerilla warfare, urban fighting, explosives, assassination and kidnaping, and that it purchased, stored and transported weapons and explosives, and made efforts to obtain the components of nuclear and chemical weapons. Count One also declares that al Qaeda trained the persons responsible for the killing of 18 members of the United States armed forces in Mogadishu, Somalia, on October 3-4, 1993. The indictment further charges that on August 7, 1998 members of al Qaeda carried out the bombing of the United States embassy in Nairobi, Kenya causing more than 212 deaths and injuring 4,500 people, and the bombing of the United States embassy in Dar es Salaam, Tanzania that caused 11 deaths and injuries to 85 people.
 
 
 5
 On September 24, 1997, prior to the embassy bombings, El-Hage was called to testify before a grand jury in the Southern District of New York investigating the activities of Bin Laden and al Qaeda. Based on his testimony that day El-Hage was indicted and charged with seven counts of perjury (Counts 245 through 251) concerning his contacts with Bin Laden and al Qaeda and his knowledge of their activities. After the embassy bombings, El-Hage was again subpoenaed to appear before the grand jury on September 16, 1998. Thirteen counts of perjury (Counts 252 through 264) were added to his indictment based on his testimony that day regarding his knowledge concerning documents found in his files in Kenya.
 
 B. Bail Applications
 
 6
 El-Hage first sought bail on September 23, 1998 when he was charged with eight counts of perjury and three counts of false statements. United States Magistrate Judge Leonard Bernikow denied bail on the ground of risk of flight, without reaching the issue of dangerousness, relying on El-Hage's foreign ties and extensive foreign travel, that he had previously failed to appear on a minor bad check charge in Texas, the dishonesty element of the perjury charges, and the gravity of the then-unindicted accusations against him. On November 17, 1998 the district court judge toured the wing of the Manhattan Metropolitan Correctional Facility where El-Hage is held.
 
 
 7
 After he was indicted on the subsequent conspiracy charges, defendant again sought bail on February 8, 1999 before United States District Court Judge Leonard B. Sand. Judge Sand denied bail, citing the government's "overwhelming case for detention based on danger to the community and risk of flight." El-Hage filed the instant bail application, from the denial of which this appeal has been taken, on December 6, 1999.
 
 
 8
 In opposition to the most recent bail motion, the government submitted a detailed affirmation by an Assistant United States Attorney which alleged El-Hage played a significant role in al Qaeda's operations from at least 1992 until his arrest in 1998. Defendant was one of Bin-Laden's trusted associates, privy to al Qaeda's secrets and plans, served as Bin Laden's personal secretary, traveled on his American passport on Bin Laden's behalf, moved Bin Laden's money, and worked in Bin Laden's factories in the Sudan - factories which served as a cover for the procurement of chemicals and weapons.
 
 
 9
 Documents found on El-Hage's computer seized at his home in Nairobi, Kenya in 1997, the affirmation continues, details El-Hage's role and his overall dangerousness. Other evidence, apart from this computer record, confirms El-Hage's role in conveying military orders from Bin Laden including the direction that the East African cell (which later carried out the embassy bombings) "militarize," and that defendant had a role in providing false passports and in seeking weapons including Stinger missiles for al Qaeda members. Passport photographs of al Qaeda members who participated in al Qaeda's efforts against American troops in Somalia were also recovered in the Kenya files.
 
 
 10
 The accused clearly has the ability to flee. El-Hage has been a frequent traveler who lived in Afghanistan, Pakistan and the United States in the 1980's, eventually moving to the Sudan in 1992 and Kenya in 1994, before returning to the United States in 1997. By his own admission, while living in the Sudan and Kenya, he traveled to Tanzania, Somalia, Italy, Slovakia, Russia, Afghanistan, Pakistan, England and other countries. He has demonstrated access to false travel documents.
 
 C. Conditions of Confinement
 
 11
 Defendant's trial is expected to start on September 5, 2000 and to continue for six to nine months, at which point he will have been confined 30-33 months without a conviction. He was subject to solitary confinement for the first 15 months of his detention, but before the January 10, 2000 hearing, he was permitted to have a cellmate. In addition, the government has revised El-Hage's S.A.M. conditions to give him seven extra minutes of time in each phone call to his family and to provide him with a plastic chair so that he can review documents more comfortably. He is also permitted three calls per month to his family, rather than the one call per month usual for inmates in administrative detention.
 
 
 12
 At that same hearing, Judge Sand suggested, and the government agreed, that an earlier trial date could be set for the perjury charges and that the detention question could be revisited thereafter, but El-Hage declined that offer and insisted on a single trial on all charges against him. The district court then denied El-Hage's motion for bail, finding "no reason to conclude that the risk of flight as of January 10, 2000, is any less than it was at a prior hearing on the matter," and that "nothing has happened since the earlier hearings which causes the Court to believe that dangerousness is in any way reduced." The district court also found, without discussion or analysis, no due process violation arising from El-Hage's continued confinement or the conditions of such confinement.
 
 DISCUSSION
 
 13
 Defendant declares that despite reams of exhibits in his case there is not a single witness who can state directly that defendant was a member of al Qaeda, knew of any plans to commit violent acts against United States citizens and property, or that he knowingly committed any act in furtherance of any illegal objective. He believes his right to due process has been denied because his confinement denies him the right to participate in the preparation of his defense.
 
 
 14
 The government justifies its very lengthy pretrial detention of defendant and its opposition to his bail motion on the trial court's findings of risk of flight and dangerousness. Further, the government urges that the prison restrictions on El-Hage also do not violate due process and that defendant is not entitled to an evidentiary hearing.
 
 
 15
 Under our system for the fair administration of criminal justice the government in all its actions is bound by fixed rules of law so that a citizen can ascertain with some degree of certainty how the government will use its power in a given circumstance and can use that knowledge to conduct his or her affairs. The fixed rules implicated on this appeal are those derived from the concept of due process of the law, the subject to which we now turn.
 
 
 16
 I Due Process and the Length of Confinement
 
 
 17
 In determining whether El-Hage's pretrial detention violated his due process rights, we review the district court's factual determinations for clear error. See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995). The constitutional significance of those findings, including the ultimate determination of whether due process has been violated, is reviewed de novo. United States v. Millan, 4 F.3d 1038, 1043 (2d Cir. 1993).
 
 
 18
 It is well-settled that so long as pretrial detention is administrative rather than punitive, it is constitutional. See United States v. Salerno, 481 U.S. 739, 746-51 (1987); Bell v. Wolfish, 441 U.S. 520, 535-40 (1979); Millan, 4 F.3d at 1042. Whether detention is punitive rather than regulatory generally turns on "whether an alternative purpose to which [the detention] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose." Wolfish, 441 U.S. at 538. To determine whether the length of pretrial detention has become unconstitutionally excessive, a court must weigh: (1) its length, (2) the extent of the prosecution's responsibility for delay of the trial, (3) the gravity of the charges, and (4) the strength of the evidence upon which detention was based, i.e., the evidence of risk of flight and dangerousness. See United States v. El-Gabrowny, 35 F.3d 63, 65 (2d Cir. 1994).
 
 
 19
 (1) Length. While the length of pretrial detention is a factor in determining whether due process has been violated, the length of detention alone is not dispositive and "will rarely by itself offend due process." Millan, 4 F.3d at 1044 (quoting United States v. Orena, 986 F.2d 628, 631 (2d Cir. 1993); see El-Gabrowny, 35 F.3d at 65. El-Hage's pretrial detention has already been long, and is realistically projected to continue for a very long time. Nevertheless, the duration of the detention is not wholly unprecedented, especially for a complex case involving an extensive conspiracy. For example, in El-Gabrowny, a case arising out of the World Trade Center bombing, the prisoner had been detained 18 months at the time of the hearing and no verdict was expected for another nine months. In Millan, a heroin trafficking case, we permitted a detention that had lasted 24 months at the time of hearing and was expected to last a total of 30 to 31 months before a verdict could be obtained.
 
 
 20
 At the same time, due process concerns in cases involving similar periods of detention have, on occasion, compelled the defendants' release on bail. See United States v. Ojeda Rios, 846 F.2d 167 (2d Cir. 1988) (holding unconstitutional the continued detention of a defendant who had been in custody for 32 months and whose trial was not expected to start for another four months); United States v. Gonzales Claudio, 806 F.2d 334 (2d Cir. 1986) (finding unconstitutional the continued detention of a prisoner who had been in custody for 14 months and was expected to be held for another 12 months during the course of trial). Hence, the length of El-Hage's detention weighs heavily in his favor in his argument that his due process rights have been violated.
 
 
 21
 (2) Responsibility for Delay. In this case, the prosecution appears to bear very little responsibility for the delay of trial. Everyone involved agrees that the underlying case is of exceptional complexity and that discovery and trial preparation are of necessity extremely time-consuming for both sides. The district court did not find any delay attributable to the government. Indeed, it was defense counsel who, when Judge Sand suggested it, declined an early trial solely on the perjury and false statement counts. This finding on responsibility for delay was not clearly erroneous and weighs against El-Hage's argument that his due process rights have been violated.
 
 
 22
 (3) Gravity of the Charges. As discussed above, El-Hage is charged with playing a vital role in a worldwide terrorist organization believed to have orchestrated several violent attacks and to pose a substantial threat to national security interests. Thus this factor also weighs heavily in the government's favor.
 
 
 23
 (4) Strength of the Proof. Last, we come to the strength of the evidence underlying the detention. The evidence in this case is similar to, albeit somewhat weaker than, that in El-Gabrowny. The district court correctly found that El-Hage is quite capable of flight, given his apparent access to false documents, his extensive history of travel and residence in other countries, and his alleged ties to an extensive and well-organized terrorist group whose leader and seven other of whose indicted members are still at large. His indictment and upcoming trial on well-publicized, very serious charges for which, if he is convicted, life imprisonment is a likely sentence, give him a strong motive to flee. Although El-Hage is an American citizen with a wife and seven small children in Texas, who presented himself for both of his grand jury hearings, he nevertheless represents a serious flight risk.
 
 
 24
 With respect to dangerousness, the district court explicitly found that El-Hage would not be able to resume his active role in al Qaeda if he were released, but found that his knowledge of the extent of the government investigation, if communicated to other al Qaeda members, would be dangerous to the United States. While El-Hage himself has not been accused of performing violent acts, he is accused of playing a central role in a conspiracy to kill U.S. nationals. In an ordinary case, the risk of the defendant's flight alone might not justify a detention of this length. A longer pretrial detention is more justifiable for a defendant found to be dangerous than for a defendant who presents only a risk of flight. This is because release of the former risks injury to other persons and the community, while release of the latter ordinarily risks only the loss of his conviction and imprisonment. See Orena, 986 F.2d at 631.
 
 
 25
 Here, the defendant's capacity for flight exacerbates his dangerousness. El-Hage may be incapable of resuming his alleged former role in al Qaeda. Nevertheless, the evidence amply demonstrates the organization's strong interest in evading the United States government. Even though he was not given access to classified information, pretrial discovery has provided El-Hage with a significant quantity of information that the government has collected about al Qaeda as part of its case. If al Qaeda had access to this information, it might be better able to avoid U.S. or other investigators both in planning possible future terrorist actions and in hiding the evidence of its past crimes, as the district court found. In this case, where the killings underlying the charges were extraordinary in scale and were also allegedly deliberate acts of terrorism, not only were the district court's findings as to risk of flight and dangerousness not clearly erroneous, but the evidence supporting them is strong.
 
 
 26
 Legal Conclusion. Consequently, after weighing the length of the delay, the government's lack of fault in causing the delay, and the strength of the evidence, we conclude that El-Hage's continued detention is regulatory and that a rational purpose may be assigned it. Hence, the detention does not violate defendant's rights to due process.
 
 
 27
 II Due Process and the Conditions of Confinement
 
 
 28
 El-Hage asserts that the conditions of his confinement violate his due process rights because they restrict his ability to prepare his own defense. In Turner v. Safley, 482 U.S. 78, 87 (1987), the Supreme Court clarified what standard of review governs inmates' constitutional claims. To determine whether a prison regulation "burdens fundamental rights," the reviewing court asks whether the regulation is "'reasonably related' to legitimate penological objectives, or whether it represents an 'exaggerated response' to those concerns." Id. Turner outlined a four-factor test for evaluating whether a prison regulation that allegedly violates a constitutional right is reasonably related to a valid correctional objective. The court must consider first whether there is a "valid, rational connection" between the regulation and the legitimate governmental interest used to justify it; second, whether there are alternative means for the prisoner to exercise the right at issue; third, the impact that the desired accommodation will have on guards, other inmates, and prison resources; and fourth, the absence of "ready alternatives." Id. at 89-91; accord United States v. Felipe, 148 F.3d 101, 110 (2d Cir. 1998).
 
 
 29
 Where the regulation at issue imposes pretrial, rather than post-conviction, restrictions on liberty, the "legitimate penological interests" served must go beyond the traditional objectives of rehabilitation or punishment. See McGinnis v. Royster, 410 U.S. 263, 273 (1973) ("[I]t would hardly be appropriate for the State to undertake in the pretrial detention period programs to rehabilitate a man still clothed with a presumption of innocence."); cf. Schall v. Martin, 467 U.S. 253, 263-64 (1984) (upholding pretrial detention of juvenile delinquents only after a finding of "serious risk" on the ground that it served a legitimate, nonpunitive regulatory purpose). The government contends the restrictions imposed on El-Hage are reasonably related to the nonpunitive objective of protecting national security interests. It maintains that the challenged conditions serve the regulatory purpose of preventing El-Hage from communicating with his unconfined co-conspirators, and thereby from facilitating additional terrorist acts by those co-conspirators. See Wolfish, 441 U.S. at 535. The government has supported these assertions with ample evidence of the defendant's extensive terrorist connections.
 
 
 30
 In Felipe, we upheld even more onerous restrictions, including a virtual ban on communications with others, aside from prison employees, Felipe's attorney, and five approved individuals. Though Felipe involved restrictions imposed on a convicted felon sentenced to imprisonment, the governmental interest behind those restrictions related to security concerns, just as they do in the case at hand, and they were not intended as part of Felipe's punishment or rehabilitation. The security concerns in Felipe might have been more acute because Felipe had ordered murders and beatings from prison, unlike El-Hage who is not alleged to have made any illegal communications from prison. However, the restrictions at issue in Felipe were correspondingly more severe than those we are reviewing (e.g., defendant Felipe had no cellmate and was not allowed visits with his attorney or family members). In this light, we conclude that the conditions of El-Hage's confinement are reasonably related to the government's asserted security concerns.
 
 
 31
 The alternative to El-Hage's current confinement conditions appears to be his confinement as part of the general prison population. Because his dangerousness arises out of the information he might communicate to others, it was reasonable for the government to find that alternative unacceptable.
 
 III Denial of an Evidentiary Hearing
 
 32
 El-Hage argues, citing only United States v. Lee, 79 F. Supp.2d 1280 (D.N.M. 1999), that he was entitled to an evidentiary hearing below because the government has not identified any documents that, if revealed, would pose a threat to the security of the United States. A detention hearing need not be an evidentiary hearing. While the defendant may present his own witnesses and cross-examine any witnesses that the government calls, either party may proceed by proffer and the rules of evidence do not apply. See 18 U.S.C. §3142(f) (1994 & Supp. III 1997); Ferranti, 66 F.3d at 542. Nothing in Lee contradicts this proposition. The district court proceedings here, which have included three detention hearings to date and left open the possibility of more hearings if circumstances warrant, were adequate.
 
 CONCLUSION
 
 33
 The order of the district court is accordingly affirmed.
 
 
 
 NOTES:
 
 
 *
 Hon. David G. Trager, United States District Court Judge for the Eastern District of New York, sitting by designation.