**UNITED STATES of America**

v.

**Sami Amin AL–ARIAN, Sameeh Hammoudeh, Ghassan Zayed Ballut, Hatim Naji Fariz, Defendants.**

No. 8:03–CR–77–T–30TBM.

United States District Court,
M.D. Florida,
Tampa Division.

April 10, 2003.

Walter E. Furr, U.S. Attorney, U.S. Attorney's Office, Tampa, FL, Daniel W. Eckhart, U.S. Attorney, Office of the U.S. Attorney, Orlando, FL, for United States of America.

Jeffrey Geldert Brown, Florin, Roebig & Walker, P.A., Palm Harbor, FL, Franklyn Louderback, Louderback and Helinger, Bruce G. Howie, Piper, Ludin, Howie & Werner, P.A., St. Petersburg, FL, Sami Amin Al–Arian, pro se, Coleman, FL, Nicholas M. Matassini, The Matassini Law Firm, P.A., Linda G. Moreno, The Solomon Tropp Law Group, Daniel Mario Hernandez, Law Office of Daniel M. Hernandez, Donald E. Horrox, M. Allison Guagliardo, Federal Public Defender's Office, Hatim Naji Fariz, pro se, Tampa, FL, Richard P. Condon, Law Office of Richard P. Condon, Kissimmee, FL, Stephen N. Bernstein, Stephen N. Bernstein, P.A., Gainesville, FL, Ghassan Zayed Ballut, pro se, Tinley Park, IL, for Defendants.

## ORDER

PIZZO, United States Magistrate Judge.

The government has moved to detain each Defendant pursuant to 18 U.S.C. § 3142(f)(1)(A) and (B). After a detention hearing, and having considered the factors outlined in 18 U.S.C. § 3142(g), the government's motions to detain Defendants Al–Arian and Hammoudeh are granted but denied as to Defendants Fariz and Ballut.

## I.

The Bail Reform Act requires a judicial officer to consider certain factors when deciding if conditions of release can be set reasonably assuring a defendant's presence as required and the safety of any other person and the community. These are: (1) the nature and circumstances of the crime charged, and particularly whether the offense is a crime of violence; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. *See* 18 U.S.C. § 3142(g). The government must show the defendant is a serious flight risk by a preponderance of the evidence and dangerousness by clear and convincing evidence. *See* 18 U.S.C. § 3146(f); *United States v. King,* 849 F.2d 485, 489 (11th Cir.1988). In this case, because all the Defendants are charged with conspiracy to kill, maim, or injure persons in a foreign country (18 U.S.C. § 956(a)(1); count 2), a rebuttable presumption exists that each Defendant is a flight risk and a danger to the community. *See* 18 U.S.C. § 3142(e). Thus, each Defendant carries the burden of production to come forward with evidence to rebut these presumptions. In other words, every Defendant has the burden to produce evidence "to suggest that he ... [is] either not dangerous or not likely to flee if turned loose on bail." *United States v. Quartermaine,* 913 F.2d 910, 916 (11th Cir.1990) (quoting *United States v. Hurtado,* 779 F.2d 1467, 1479 (11th Cir.1985)).

Although the Bail Reform Act does not list the length of pretrial delay as a factor a court should consider in weighing conditions of release, the Eleventh Circuit has recognized, accepting the Second Circuit's reasoning, that "at some point and under some circumstances, the duration of pretrial detention becomes unconstitutional." *Quartermaine,* 913 F.2d at 917 (quoting *United States v. Gonzales Claudio,* 806 F.2d 334, 339 (2d Cir.1986)).[1] In this case the pretrial delay will be more than a year, perhaps two. Added to this is the length of the anticipated trial—six months to a year. To determine if pretrial detention will become excessive, courts look to these factors: (1) its length, (2) the extent of the prosecution's responsibility for the delay of the trial, (3) the gravity of the charges, and (4) the strength of the evidence upon which detention was based. *United States v. El–Hage,* 213 F.3d 74, 79 (2d Cir.2000).

## II.

### A. Perspective

All the Defendants are charged with being members of an international terrorist organization, the Palestinian Islamic Jihad Shiqaqi Faction (PIJ). Comprehending the seriousness of the offenses leveled against these Defendants requires perspective. In the overwhelming majority of cases prosecuted in federal court, the charged offense impacts no more than a few victims. For some cases, like serious drug crimes or organized criminal rings, the breadth of the affected might extend to a neighborhood or the local community. And almost always, the prospect of economic gain drives the conduct. This case is different. The breadth of the affected here extends to nations and world regions. Moreover, a zealous commitment to a violent philosophy fuels the actors. Appreciating the magnitude of the accusations requires examining the PIJ's structure, the Defendants' positions within the organization, and their claimed interaction with one

---

1. So long as pretrial detention is administrative rather than punitive, it is constitutional. *See United States v. Salerno,* 481 U.S. 739, 746–51, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

another against the backdrop of the events occurring in the Mid–East during critical dates.

### B. The government's proffer

The PIJ considers itself the "vanguard of the Islamic Revolutionary Movement." (Court's ex. 3). Its creed is blunt, violent, and uncompromising. The PIJ rejects any peaceful solution to the Palestinian question. It advocates the destruction of Israel, the elimination of Western influence, particularly from the United States, in the region, and the creation of an Islamist state. And it aims to achieve all this through terror—the senseless, brutal murder of innocents in public places designed to instill fear, instability, and panic in the populace and the government of Israel. The PIJ killed over a hundred in Israel and the occupied territories during the period referenced in the indictment. It maimed many more. The roll call of dead and wounded included Americans.

The "Secretary General" and a ten-member "Shura Council," or managing board of directors, run the PIJ. Fathi Shiqaqi acted as the PIJ's Secretary General from its beginning until his assassination in October 1995. Defendants Al–Arian, Muhammed Tasir Hassan Al–Khatib (Al–Arian's brother-in-law), Abd Al Aziz Awda, Ramadan Abdullah Shallah, and Bashir Musa Mohammed Nafi served on the Shura. The PIJ operates cells worldwide. For example, Al–Arian, according to the government, acted as the PIJ's leader in North America and operated the Tampa cell that included Defendants Shallah (for a time), Hammoudeh, Fariz, and Mazen

Al–Najjar (Unindicted Co–Conspirator Twelve and Al–Arian's brother-in-law). Defendants Ballut and Fariz, until he recently moved to this district, were alleged members of the PIJ's Chicago unit. Notably, the PIJ paid some members, like Hammoudeh and Al–Najjar, though they were not on the Shura.

Al–Arian, Shallah, Hammoudeh, and Mazen Al–Najjar taught or attended the University of South Florida (USF); the government asserts this was not a coincidence. USF provided them academic cover and the opportunity to bring PIJ members and associates into the United States. *See* doc. 1 at ¶s 16 and 28. From 1986 through the return of the indictment, Al–Arian served on the engineering faculty.[2] Shallah taught Mid–East studies in the early 1990's. Al–Najjar entered USF as a student in 1986 and eventually earned his Ph.D. in industrial engineering in 1994. Hammoudeh is a candidate for his Ph.D. in applied anthropology and an adjunct professor. *See Al Najjar v. Ashcroft*, 257 F.3d 1262, 1271–1273 (11th Cir.2001) (outlining Shallah's and Al–Najjar's relationship to USF and the PIJ).[3]

The Tampa cell used other covers besides USF. The government proffered Al–Arian and other PIJ members conducted PIJ activity through three fronts, the Islamic Concern Project, Inc. (ICP), the World and Islam Studies Enterprise, Inc. (WISE), and the Islamic Academy of Florida, Inc (IAF). Al–Arian incorporated both ICP, ostensibly a charitable organization, and WISE, a think tank for Islamic issues, in the late 1980s and early 1990s.

---

**2.** Al–Arian's curriculum vitae states he became an assistant professor at USF in 1986 and an associate professor in the Computer Science and Engineering Department in 1992 (Al–Arian ex. 9). From 1995 through 1998 he took administrative leave. After the grand jury indicted Al–Arian, USF terminated his position.

**3.** This case involves Al Najjar's and his wife's challenges to deportation orders. The INS presented evidence during their deportation proceedings about Al–Najjar's and Shallah's involvement with WISE and the PIJ.

Al–Najjar acted as executive director of ICP and WISE. WISE also employed Shallah and Hammoudeh. And both Al–Arian and Hammoudeh are officers of IAF, a private Muslim school offering classes from kindergarten through high school. Al–Arian, who founded the school along with Al–Najjar, was its principal and chairman of the board; Hammoudeh is the assistant principal and, according to the government, its treasurer.

From February 1992 through January 22, 1995, the PIJ tried to derail the peace process through suicide attacks within Israel and the occupied territories in places named Hula, Afula, Mirage Junction, Netzarim Junction, and Beit Lid. *See* doc. 1, ¶ 43(11, 13, 80, 109, 115, and 121). Dozens died. Over a hundred injured. Despite the carnage, the political leaders in the region progressed toward peace. In September 1993, the Israel–Palestinian Declaration of Principles (Oslo Accords) was signed. The PLO acknowledged Israel's right to exist, and the declaration accepted United Nations resolutions renouncing terrorism. In October 1994, the Nobel Committee awarded Israel's Prime Minister, Yitzhak Rabin, and the Palestinian's chairman, Yasser Arafat, its Peace Prize as a consequence of the Oslo efforts. That same month, Jordan and Israel signed a peace treaty. After several wars and decades of instability in the region, the world could genuinely hope for peace.[4]

The PIJ, however, abhorred any peaceful solution. On January 22, 1995, it sent two of its operatives to Beit Lid, Israel for a double suicide attack. The bombers killed twenty-two as if to emphasize to all the PIJ's commitment to its violent, uncompromising creed. The brutality also portended a pattern of savage attacks.

The PIJ trumpeted these killings, denounced the Clinton administration's peace efforts, criticized any Arab government which supported the peace process, and condemned the Palestinian Authority's crackdown on PIJ members. The day after Beit Lid, the President issued Executive Order No. 12947. Claiming a national emergency, he declared the PIJ's "grave acts of violence" threatened to disrupt the peace process and constituted "an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." The order designated the PIJ, the Abu Nidal Organization, Hizballah, and Hamas, as "terrorist organizations" and PIJ's secretary general, Fathi Shiqaqi, and spiritual leader, Abd Al Aziz Awda, as "Specially Designated Terrorists." *See* 60 FR 5079. It also barred all financial transactions with these groups or individuals. *Id.* Sadly, the order had no effect on the carnage, nor on PIJ member's efforts to raise funds in the United States for the group's brutal methods. More than two months later, a suicide bomber in an automobile detonated a bomb beside a bus in Kfar Darom, Gaza Strip. Eight died, including a twenty year-old American woman; forty were wounded including three Americans.

In October 1995, unknown assailants assassinated Fathi Shiqaqi in Malta. Shallah, who had just departed WISE and USF in June, quickly and publicly pronounced himself the new secretary general for the PIJ. He also vowed to "eradicate" Israel, avenge the fallen leader's murder, and praised Yizhak Rabin's recent assassination. A month later, President Clinton added Shallah to the list of "Specially Designated Terrorists." The Secretary of State, two years later, listed the PIJ as a

---

4. The government, admittedly, did not detail all the world events as reported here. Nonetheless, this Court takes judicial notice of these historical facts to give perspective to the

seriousness of the charged crimes and particularly those overt acts occurring during the relevant dates.

"foreign terrorist organization" pursuant to the Antiterrorism & Effective Death Penalty Act of 1996 (8 U.S.C. § 1189) (doc. 1, ¶ 22). *See also Al Najjar*, 257 F.3d at 1273. Consequently, it became illegal for any person within the United States or subject to its jurisdiction to provide material support to the PIJ. *See* 18 U.S.C. § 2339B.

The PIJ continued its campaign of terror: thirteen dead and forty wounded in the Dizengoff Center Shopping Mall on March 4, 1996; twenty injured in a suicide car bombing in Mahane Yehuda Market in Jerusalem on November 6, 1998; two more killed at the same market on November 2, 2000; two murdered and forty-six wounded in a shooting attack on a bus in the French Hill area of Jerusalem on November 4, 2001; seventeen killed and forty-five injured in a bus bombing near Megiddo Junction on June 3, 2002; fourteen killed and fifty wounded at Karkin Station on October 20, 2002, in a bus blast; and twelve killed on November 15, 2002, in Hebron. Throughout all these events, the government contends the Defendants remained committed to the PIJ and its violent acts.

## III.

### A. Applying Section 3142(g)

#### 1. the charged offenses

The indictment covers roughly twenty years in 121 pages and fifty counts. It accuses the Defendants with committing various violent crimes, some carrying potential life sentences, and offenses impacting the due administration of justice and the application of immigration of laws. These include: conspiracy to commit racketeering (count one)[5]; conspiracy to murder, maim, or injure persons at places outside the United States (count two)[6]; conspiracy to provide material support to designated terrorist organization (count three)[7]; conspiracy to make and receive contributions of funds, goods, or services to or for the benefit of specially designated terrorist (count four)[8]; thirty-nine Travel Act violations (counts five through forty-four)[9]; attempt to procure citizenship or naturalization unlawfully (count forty-five)[10]; false statement in an immigrant application (count forty-six)[11]; and obstruction of justice (count forty-seven).[12]

Admittedly, the government does not contend these Defendants plotted suicide attacks or recruited PIJ bombers. The

---

**5.** See 18 U.S.C. § 1962(d); the potential sentence is life imprisonment. All the Defendants are charged in this count.

**6.** See 18 U.S.C. § 956(a)(1); the potential sentence is life imprisonment. All the Defendants are charged in this count.

**7.** See 18 U.S.C. § 2339B; this offense carries up to fifteen years imprisonment. All the Defendants are charged in this count.

**8.** See 18 U.S.C. § 371; this offense is punishable by up to five years imprisonment. All the Defendants are charged in this count.

**9.** See 18 U.S.C. § 1952(a)(2) and (3); this offense is punishable by up to twenty years imprisonment. All the Defendants are

charged with Travel Act crimes: Al–Arian in counts 5–9, 11–13, 15, 18–20, 25–32, and 39; Hammoudeh in counts 5–9, 11–13, 15, 33–34, and 39; Fariz in counts 35–38 and 40–44; and Ballut in counts 19, 36–38, 40–42.

**10.** See 18 U.S.C. § 1425(b); this offense is punishable by up to ten years imprisonment. Only Al–Arian is charged in this count.

**11.** See 18 U.S.C. § 18 U.S.C. § 1546(a); this offense is punishable by up to twenty-five years imprisonment. Only Hammoudeh is charged in this count.

**12.** See 18 U.S.C. § 1505; this offense is punishable by up to five years imprisonment. Of the four Defendants, only Al–Arian is charged in this count (along with Bashir Musa Mohammed Nafi).

PIJ presumably divides its labor and assigns various tasks to its members. Thus, while these Defendants did not plan the attacks, the government argues they supported them, applauded the PIJ's tactics, promoted its activities and organization, raised monies to fund its terror operations, and gave succor to the families of bombers in order to encourage a policy designed to entice new human weapons.[13]

The nature and circumstances of these violent acts dramatically weighs against the Defendants. These are not the heartland violent crimes Congress contemplated in the Bail Reform Act. This terror rips civilization's fabric. It threatens this country's national security, foreign policy, and economy, a conclusion the national leadership shares as evidenced by executive orders and State Department designations. And the PIJ's actions incite others, whether organized groups or self-proclaimed super-empowered individuals, to use the same condemnable tactics.

### 2. weight of the evidence

The indictment details in 255 overt acts the respective activities of the Defendants during their participation in the enterprise. These acts, together with the government's proffer, show a consistent pattern of activity by some of the Defendants designed to promote, manage, and fund the PIJ. And the government obtained most of its evidence against the Defendants through wiretaps and searches of their residences or businesses. In fact, the gov-

ernment candidly admits conducting electronic surveillance pursuant to the Foreign Intelligence Surveillance Act (FISA) on one or more of the Defendants or unindicted coconspirators from 1993 through December 2002, the last overt act referenced in the indictment (doc. 1, ¶ 43(255)). See 50 U.S.C. § 1801 et seq.[14]

### a. Sami Amin Al–Arian

The government's proffer and the lengthy indictment details Al–Arian's prominence within the PIJ's leadership. Born in Kuwait and having entered the United States in 1975 on a student visa, he is a trusted, influential organizer, a key fund-raiser, and thinker to the PIJ. Indeed, PIJ leaders, after encountering financial difficulties in the mid–1990's, asked him to conduct a worldwide audit of PIJ assets (doc. 1, ¶ 43(43)). As the government reports, the number of pertinent intercepted telephone calls and faxes involving him or directed to him are staggering. The searches of the WISE/ICP offices on November 20, 1995, turned up items that confirmed the intense role he played within the PIJ: the PIJ Manifesto (Court's ex. 3); a computer file revealing the wills of two PIJ suicide attackers; a communique between the PIJ and Hamas lamenting the violence between the groups and vowing future cooperation and civility; a letter from an unindicted coconspirator identifying Al–Arian and other Shura members as part of his group and authorizing Al–Arian's use of pledged funds irrespective of

---

**13.** Agents seized the PIJ's Manifesto from WISE offices in November 1995. In a section entitled, "Principles and Thoughts of the Movement" [which is the Islamic Revolutionary Movement], the PIJ announces, "The masses are the tool of the Revolution against the oppressors [i.e., anyone, group, or nation disagreeing with the PIJ's goals]. They are the real and strategic dimension." See Court's ex. 3.

**14.** The Defendants strenuously argue the government's use of any wiretap secured via FISA taps violates their Fourth Amendment guarantees. At this juncture, however, this Court is bound to consider the government's proof, no matter what future constitutional challenges the Defendants make. United States v. Apker, 964 F.2d 742, 744 (8th Cir. 1992) (wiretap challenged); United States v. Angiulo, 755 F.2d 969, 974 (1st Cir.1985) (same).

the donor's intent. When agents searched Al–Arian's house that same day, they found similar incriminating evidence: a document entitled "Charter of the Center of Studies, the Intelligence and the Information" which outlines in complex detail a method for establishing an organization for spreading an international "Islamic Movement" including using intelligence and security techniques such as ciphers (Court Exhibit # 2); and a letter Al–Arian wrote to a Kuwaiti legislator asking he donate to the PIJ because the families of the bombers in the Beit Lid terror attack needed funds and the PIJ needed his monetary assistance for future terror operations.[15]

After the November 20, 1995, searches, Al–Arian, understandably cautious, limited his phone use, but he still remained committed to the PIJ. Instead of discussing PIJ business openly like before, he avoided using his home telephone, instructed others to be careful, or used coded terms to conceal the subjects of conversations (*see e.g.*, doc.1, ¶ 43 (188, 189, 191, 194, 195, 196, 198, 200, 219, 220, 221)). Throughout the time of the conspiracy, he remained acutely wired to PIJ events and its bombing campaign. And, despite the searches of his home and workplaces, the deportations of Mazen Al–Najjar and Al–Arian's sister, the revelations about PIJ activity during those deportation proceedings, the countless inquiries by the press, and the investigations by USF, Al–Arian remained steadfast to the PIJ. He continued to raise PIJ funds (doc. 1, ¶ 43 (194, 197, 200, 201, 203, 205, 207, 220, 221)) and to play a leadership role within the PIJ (doc. 1, ¶ 43(227)).[16] The government's case against Al–Arian is both substantial and convincing.[17]

### b. *Sameeh Hammoudeh*

Hammoudeh, who was born in the West Bank, reasonably argues he arrived in the

---

**15.** Al–Arian dismisses all this. First, he contends the agents found the WISE items in Shallah's office and computer, a room Al–Arian proffers Shallah kept locked. Al–Arian also dismisses the significance of the intelligence study found at his home. He proffered the document, authored by some young students in their late teens or early twenties at a conference, dates back to the early 1980's and is insignificant. I find his positions unconvincing. Roughly two-thirds of the racketeering conspiracy's 256 overt acts predate these searches. These acts, almost always, track PIJ activity through intercepted calls and faxes. With a few exceptions, Al–Arian is referenced in all the overt acts up to the search (doc. 1, ¶ 43(186)). These calls detail his association with the PIJ, Shallah, and other Shura members. Further, the seized documents found at Al–Arian's residence are damaging. The study, at least from my reading, bears a broad strategic resemblance to the Manifesto and advocates the use of a university to achieve the Center's aims. The letter Al–Arian wrote to the Kuwaiti speaks plainly to Al–Arian's participation and focus.

**16.** Overt acts 194, 197, 200, 201, 203, 205, 207, 220, 221 are Al–Arian intercepts or ones about him. All take place between January 27, 1998, and August 8, 2000. In these, the government concludes Al–Arian is raising PIJ funds or involved in PIJ finances given the speakers' use of code for money amounts ("shirts," "magazines," or "things" generally as units for $1,000). Al–Arian contends several of these acts (194, 203, 205, 207, 220, 221) concern his efforts to help his brother-in-law, Mazen Al–Najjar, during pending deportation proceedings, and he offers an affidavit by Mazen's father, Abdel Karim S. Al–Najjar (also Al–Arian's father-in-law) to confirm this. *See* Al–Arian ex. 31. But after comparing the affidavit to specific overt acts, I do not find it persuasive. Most of the overt acts do not even reference Mazen as a topic of conversation. Nor does the affidavit account for the speakers' need for code terms.

**17.** To counter the government's proffer, Al–Arian submitted excerpts from an immigration judge's decision in the Al–Najjar matter (Al–Arian ex. 4) and William Reece Smith's report to USF (Al–Arian ex. 5). The records before these fact-finders did not include the FISA intercepts.

United States months later than the government says and may have sent some money to his family or to charity rather than the PIJ as the government claims. Nevertheless, the weight of the evidence against him is substantial. A variety of sources and events prove Hammoudeh's longstanding association and involvement with the PIJ. First, several Shura members agreed the PIJ should pay Hammoudeh $1,000 a month for his services, a strong confirmation for Hammoudeh's value to the organization. For example, on January 22, 1994, Defendant Abd Aziz Awda spoke to Al–Arian about Hammoudeh. Awda admitted he told Shiqaqi the PIJ should pay Hammoudeh a salary. Shiqaqi replied he had paid Hammoudeh and other members of the PIJ cell a substantial amount of money in 1993 (doc. 1, ¶ 43(31)). This conversation occurred just a month after Hammoudeh arrived in Tampa from Palestine to study at USF. And the timing convincingly suggests Hammoudeh provided valuable services to core PIJ leaders long before he arrived in the United States. Three months later, in mid-April 1994, Al–Arian told Nafi that Shiqaqi should compensate Hammoudeh $19,000 in back pay. A week later, Shiqaqi wired $19,984.50 to Hammoudeh's bank account at First Union National Bank via a bank in Beirut (doc. 1, ¶ 43 (89, 93)).[18]

Hammoudeh worked with Al–Arian, Shallah and Al–Najjar at USF and WISE, and with Al–Najjar and Al–Arian at IAF. The government proffers Hammoudeh is Al–Arian's closest confidant in the United States. When Al–Arian learned Fathi Shiqaqi had been killed in Malta, he quickly met with Al–Najjar and Hammoudeh to discuss the matter. His involvement with the PIJ continued throughout the indictment period, and the government's evidence against him is substantial.

*c. Hatlm Naji Fariz*

The government's case against Fariz, unlike that for Al–Arian and Hammoudeh, is not substantial. I base this conclusion after carefully considering the impact of the government's recent "Supplement to the Record." *See* doc. 71. Acting on information it learned after its initial presentation, the government quickly and commendably corrected its proffer against Fariz:

On April 7, 2003, at 12:30 p.m., the Government was informed that the individual Hatim Naji Fariz spoke with in the conversation described at Overt Act 253 in Count I is a PIJ activist other than Abd Aziz Awda. Accordingly, references to Abd Al Aziz Awda in Overt Acts 236, 240, and 247 in Count I are suspect.

This change significantly alters the relevancy and significance of Fariz's comments. Further, the remaining unaffected

---

**18.** Hammoudeh sent considerable sums of money to the Mid–East from 2000 until the indictment's return. The government asserts he sent it to PIJ coffers; Hammoudeh counters with affidavits and documents showing he sent it to charity ("Friends of the Blind") and to purchase stock in a Palestinian company (Hammoudeh ex. 1, 8). By Hammoudeh's accounting, he sent more than $32,000 abroad in less than four years. If true, this amount represented a hefty fraction of his earned income; he made only $25,000 a year according to the government's proffer, a particularly modest salary given his numerous dependents (a wife and six children). For example, on May 17, 2000, and June 15, 2000, Hammoudeh talked to an overseas relative about sending that person $15,000. Three days after the second call, Hammoudeh complained to Mazen Al–Najjar that IAF's salary did not even cover his living expenses (doc. 1 ¶ 43 (216–218)). And the degree of Hammoudeh's generosity seems inconsistent with Al–Arian's efforts in the mid–1990s to have PIJ pay Hammoudeh back for services rendered and Hammoudeh's complaints about poor pay at IAF.

overt acts do not present a clear and convincing case that Fariz is a danger to others and the community.

Of the RICO conspiracy's 256 overt acts, Fariz is identified in seventeen, all of which are based on FISA intercepts. The first call occurs in mid-June 1995 (doc. 1, ¶ 43 (176)). Then four years pass. On October 24, 1999, an unidentified person in Chicago telephones Hammoudeh's home and says he has been trying to reach Fariz (doc. 1, ¶ 43(207)). Nothing about this conversation is particularly remarkable or illuminating to the charged offense. From that date until Fariz's final intercept in December 2002, the government identifies Fariz as a speaker in fifteen calls (doc. 1, ¶ 43 (215, 236, 238–240, 242, 244—247, 249—251, 253, 255)). All of these overt acts except 215 reference intercepts after May 2002 (by then, Fariz had moved from Chicago to this district).

Fariz, according to the indictment, speaks with Awda, then in the Mid–East, two times. On May 26, 2002, Fariz discusses fund-raising and the amount of money Fariz had sent Awda the last time (about $4,000), compared fund-raising in Chicago versus Florida (Floridians are suspicious about who receives the funds according to Fariz), and expressed frustration concerning Hamas's success in raising money (doc. 1, ¶ 43 (236)). By the date of this call, Awda had been a designated terrorist for seven years (doc. 1, ¶ 43 (122)). In their November 10, 2002, conversation (253), the two again talk about fund-raising with Fariz cautioning Awda to be wary of informants and to "compartmentalize" information. By conversing with Awda about such matters, the indictment implies Fariz had an integral relationship with a PIJ leader and Shura member. The gov-

ernment's correction changes this conclusion.

The government will now only identify the other speaker in calls 253 and 236 as a "PIJ activist." Any further description of this person, the extent of the individual's ties to the PIJ, and the reasons for the government's supplement are classified. Yet, irrespective of these revisions, the government maintains the substance of the conversations remains the same. But without Awda as one of the actors, the weight I attribute to those conversations lessens considerably. In summary, I have no confidence Fariz is discussing "PIJ business" as the government claims, especially in view of the nebulous identification of the "other person" in the intercepts. Now, Fariz's discussion on May 26, 2002 (overt act 236), can reasonably be interpreted as one about acquiring donations for legitimate Palestinian charities. The conversation on November 10, 2002, as corrected, adds little to Fariz's purported PIJ involvement. Accordingly, I will not consider overt acts 236 and 253 nor those portions of overt acts 240 and 247 (Fariz–Ballut conversations) that reference Awda.

The remaining portions of 240 and 247 and Fariz's other overt acts do not add significantly to the weight of the government's case against him.[19] The most troubling are overt acts 238, 239, part of 247, and 255. The first two concern conversations Fariz had with Ballut and then with Al–Arian about the recent Megiddo Junction bombing. The last one (255) relates to the killings in Hebron. While these conversations strongly suggest Fariz approved of the PIJ's brutal actions, the calls, without more, do not show Fariz materially supported the PIJ nor do they

---

**19.** Of Fariz's nine Travel Act counts, four are based on overt acts 236, 240, 247, and 253

(counts 35, 37, 41, and 43, respectively).

substantially add to the weight of the government's evidence.

Lastly, agents found several items at Fariz's home when they arrested him and executed a search warrant: a picture of him with a PIJ poster in the background, videos of Shallah speaking on the fifth anniversary of Fathi Shiqaqi's death, "martyr" videos, a document from the PIJ instructing members to secure PIJ information and property, and a list showing cash reserves and property of $80,000, and phone numbers of Awda and Nafi. Aside from the picture, which the government proffered, the government did not explain the purported "PIJ document" and the list of cash reserves nor connect their relationship, if any, to this case.

#### d. Ghassan Zayed Ballut

Born in the West Bank, Ballut entered the United States in 1985 and became a naturalized citizen in 1992. The government traces his PIJ association to just before he took his oath, an ICP event that took place in September 1991 in Chicago. After Al–Arian introduced Ballut as the ICP's Chicago representative, Ballut addressed the attendees. According to the government, Ballut said the way to success was clear, the rifles must be raised in one direction, the chest of the enemy, and then advised the crowd that the enemy was in the desert of Kuwait and that coalition forces were going to kill their babies in Iraq (a reference to the first gulf war). Ballut then criticized Israel for deporting Shiqaqi, who he described as a Muslim thinker and freedom fighter (doc. 1, ¶ 43(7)). Aside from Ballut's militant rhetoric, not much else, at least as of then, connects him to the PIJ.

Ballut's contacts with other PIJ members after 1991 are sporadic. In some calls, Ballut approved of the PIJ's bombing campaign. For example, in April 1994, more than two years after the 1991 ICP conference, he spoke with Al–Arian. The two discussed dates for Al–Arian's visit and an individual ("Raed") who blew himself up in a joint Hamas–PIJ venture a week earlier (this refers to the Afula suicide bombing of a bus where nine died and fifty were wounded; see doc. 1, ¶ 43 (80, 84, 87)). Ballut stated he knew about Raed but did not want to discuss it on the phone (doc. 1, ¶ 43 (85)).[20] A year later, May 24, 1995, Al–Arian asked Ballut to quickly arrange an overseas call so Al–Arian could speak to Awda's brother, Suliman, who the Israelis had arrested and released after seventy-five days. Al–Arian wanted to know what Suliman said, what questions the authorities asked, and what did authorities know (Transcript at pp. 43–44; doc. 1, ¶ 43(170)). The bulk of Ballut's intercepts occur after Fariz moved to this district from Chicago, but as noted earlier, the government has stated two of these are suspect in their references to Awda (doc. 1, ¶ 43 (240 and 247)). Like its case against Fariz, the government's case against Ballut is not particularly substantial.

#### 3. the history and characteristics of the person

The overwhelming part of the four-day detention hearing focused on each Defendant's character, physical and mental condition (including any history of drug or alcohol abuse), family and community ties, employment, criminal history, and record of court appearance. See 18 U.S.C. § 3142(g)(3)(A). All are prominent lead-

---

**20.** About this time, Ballut was facing aggravated arson charges involving the burning of his business. The details regarding Ballut and Al–Arian's business relationship are un- clear, but the government proffered Al–Arian declared a loss from the fire. Ballut was convicted of the aggravated arson, received probation, and completed his sentence early.

ers and models of civic involvement in their respective communities. Only Ballut has a prior felony conviction, nonetheless he has contributed significantly to community-based programs in the Chicago area. Family members, friends, associates, and community leaders presented glowing testimonials and letters about each ·Defendant's good character and high reputation. Al–Arian's record of civic achievement, both on the local level and national stage, is particularly outstanding. All the Defendants are well-educated. Al–Arian holds a Ph.D. in computer engineering; Hammoudeh is a candidate for his Ph.D. in applied anthropology; and both Ballut and Fariz are college-educated. All publicly preach and practice the ideals of good citizenship, tolerance, morality, and devotion to their religious faith. Echoing Al–Arian's lawyer's comments about Al–Arian, but which seemingly apply to all the Defendants, their public achievements embody the proud history of our nation's immigrants living the American dream and contributing to our national mosaic.

Yet, specifically as to Al–Arian and Hammoudeh, I must reconcile their public discourse for peace and tolerance against their intercepted dialogues promoting PIJ violence aimed at "cleansing" Palestine. Both Defendants are essentially asking me to ignore the government's convincing and substantial offer of proof laying open their secrets and, instead, witness their glowing personal achievements. This dichotomy, a private life versus a public one, however, reveals much about their character and the tenacity of their commitment to a pattern of deception for achieving the PIJ's goals.

At every turn, Al–Arian or Hammoudeh hid and obfuscated their PIJ association. Al–Arian, when attempting to procure his citizenship in late 1993 through late 1994, claimed he had never, at any time, anywhere, ever ordered, incited, assisted or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion (doc. 1, count 45). On March 16, 2000, Hammoudeh declared under penalty of perjury he had never been associated with or assisted an organization that engaged in any form of terrorism (doc. 1, count 46). From late August through October 2000, Al–Arian, during deportation proceedings involving his brother-in-law (Al–Najjar), stated he did not support freedom for Islam though violence and caused statements to be made that Al–Najjar and others were not PIJ members (doc. 1, count 47). Throughout all the USF investigations, the media inquiries, and the likely probing questions by friends and professional associates, Al–Arian and Hammoudeh remained true to the party line—they repudiated any PIJ association. But privately, they vowed their allegiance to the PIJ's cause and its brutal path.[21]

*4. dangerousness*

Besides the nature of the charged offense, courts look to the defendant's prior criminal record, or lack thereof, to gauge his potential risk for criminal conduct while on release. The reason for this is recidivists generally present a danger to the community. None of these Defendants is a recidivist in the classic sense. Nonetheless, each Defendant is presumed by direction of Congress to be a danger to

---

**21.** This Court is convinced Al–Arian and Hammoudeh, and probably Fariz and Ballut, equate support for the PIJ with support for the Palestinian dream of an autonomous state. The two are not the same. The First Amendment will always protect those who advocate for the latter. Here, the indict-

ment's focus is not protected speech but murder and attempted murder. *See generally,* *Virginia v. Black,* —— U.S. ——, 123 S.Ct. 1536, 155 L.Ed.2d 535, 2003 WL 1791218 (2003) (Virginia's ban on cross burning with intent to intimidate did not violate the First Amendment).

the community regardless of any prior record. *See* 18 U.S.C. § 3142(e) (count 2 charges a violation of 18 U.S.C. § 956(a)(1), a predicate crime triggering presumption for dangerousness and flight risk). That presumption, or evidentiary finding, "militates against release," thus counterbalancing the absence of a criminal history. *Quartermaine*, 913 F.2d at 916 ("[the presumption] remains in the case as an evidentiary finding militating against release, to be weigh[ed] along with the other factors listed in 3142(g)").

██ Because the government's case against Al–Arian and Hammoudeh is substantial and convincing, I find neither has rebutted the presumption for dangerousness. First, both have allegedly participated in PIJ activities for more than a decade. For example, the government claims Al–Arian's association dates back to the late 1980s and Hammoudeh's began in the early 1990s. For more than ten years these two repeatedly committed acts supporting the PIJ. And importantly, these two tenaciously remained loyal to the PIJ throughout years of public focus into the organization and its members (i.e., Al–Arian, Shallah, Awda, Nafi, and Al–Najjar).

Viewed from this altered perspective, namely, accounting for uncharged criminal conduct, Al–Arian and Hammoudeh fit the classic recidivist model. These two, based on the government's strong presentation, repeatedly assisted, promoted, or managed the PIJ, an organization which indiscriminately murders to achieve its goals. And both did this for years regardless of the risks, risks apparent to all from the court of public discourse. I find the government has shown by clear and convincing evidence Al–Arian and Hammoudeh pose a danger to the community, and I cannot fashion any conditions that will reasonably conform their behavior.[22]

As to Fariz and Ballut, however, the evidence against them is not substantial for the reasons set out. Each, I find, has rebutted the presumption. Unlike Al–Arian and Hammoudeh, the evidence of their strong commitment and participation in PIJ affairs is not as apparent. On the basis of the government's proffer, even factoring the presumption as a militating fact against release, I conclude I can set conditions that will reasonably assure the safety of any other person and the community.

### 5. flight risk

Ballut and Fariz are United States citizens. Al–Arian and Hammoudeh are legal residents who have been in the United States for long periods (Al–Arian entered the United States in 1975; Hammoudeh arrived in late 1992). Yet, both Al–Arian and Hammoudeh are in jeopardy of removal as evidenced by the detainers lodged with the United States Marshal by the Bureau of Immigration and Customs Enforcement (formerly known as the Immigration and Naturalization Service). While each Defendant has some family living in the Mid–East, every Defendant has substantial familial and economic ties to the United States and, with the exception of Ballut whose home is in Chicago, to this district.[23] Moreover, lines of family and friends are willing to risk their savings

---

**22.** This finding of dangerousness is enough to detain Al–Arian and Hammoudeh. Nonetheless, because the parties may appeal this order, I address each Defendant's risk of flight. *See King, supra*, 849 F.2d at 488 (a finding of either danger to the community or risk of flight will be sufficient to detain the defendant pending trial).

**23.** For example, Al–Arian reports his mother and four siblings live in Cairo. Hammoudeh's parents and some of his siblings reside in Ramallah. Ballut's mother and some of his siblings are in the West Bank. Fariz has a sister living in Jordan.

believing their loved one will appear when required. Drawing on this support, every Defendant presented impressive proposals for conditions of release using a combination of property bonds, personal sureties, and other special conditions: Al–Arian pledged approximately $3,280,000 [24]; Hammoudeh submitted about $1,025,000 [25]; Fariz offered about $1,787,000 [26]; and Ballut tendered approximately $860,000.[27] Armed with such support, each Defendant's argument rings essentially the same. No Defendant would jeopardize the wealth of their families and friends. And, while the government highlights every Defendant's familial ties to the Mid–East and emphasizes the grave penalties each Defendant faces, all the Defendants argue the United States is their home and no one will flee.

Weighing competing concerns, particularly in light of the sizable bail packages each Defendant proposes, is difficult. Three factors guide my analysis. First, by law each Defendant is presumed to be a flight risk. 18 U.S.C. § 3142(e). Next, risk of flight is directly related to the weight of the evidence. The stronger the government's case, especially if the sentence will be severe, the greater a defendant's incentive to flee.[28] And the release of any defendant always depends upon a trust that person will appear when required.

### a. Al–Arian and Hammoudeh

■ I find Al–Arian and Hammoudeh are serious risks to flee. Each, irrespective of the attractive life he has made in the United States, is willing to risk all for the PIJ's vision of Palestine. Ever since November 1995, when agents searched WISE and Al–Arian's residence, they knew the government suspected one or both. Yet, despite intense scrutiny by the government and the media, each still supported the PIJ. This assumption of the risks, this willingness to lose all for the PIJ's goals, is telling. It means each valued the PIJ more than family or lifestyle. Each mentally accepted the prospect his family could be devastated emotionally and financially by his exposure.[29] Finally, the aura of the PIJ's vision of Palestine capti-

---

**24.** Seven individuals, including Al–Arian and his wife, and the Islamic Academy are willing to pledge property with an estimated equity totaling $1,727,000. Forty-one persons are prepared to sign signature bonds in various amounts totaling $1,551,500.

**25.** Five persons, including Hammoudeh, and the Islamic Academy have agreed to post property with an equity approximating $898,000. Three individuals have stated they are willing to sign surety bonds totaling $125,000.

**26.** Six sureties are prepared to post property and assets valued at over $787,000. Ten members of Fariz's family have also offered to sign signature bonds totaling $1,000,000.

**27.** Ballut's proposed property bonds approximate an almost $600,000 from three sources including the Chicago Islamic Center and signature bonds by four family members adding up to $270,000.

**28.** An added aspect here is the length of the anticipated pretrial incarceration, perhaps as much as two years with a trial then lasting another year. The government bases its proof for dangerousness on the allegations in the indictment. For Fariz and Ballut, that proof is not substantial. A lengthy pretrial incarceration solely based on risk of flight might not be justifiable. *See El–Hage, supra,* 213 F.3d at 80 ("A longer pretrial detention is more justifiable for a defendant found to be dangerous than for a defendant who presents only a risk of flight. This is because the former risks injury to other persons and the community, while the release of the latter ordinarily risks only the loss of his conviction and imprisonment.")

**29.** Al-Arian is married with five children. Hammoudeh is married with six children.

vated Al–Arian and Hammoudeh more than the successful life each had made in the United States. In a very real sense, both see Palestine as their home. This makes each's decision to flee easier because the place he would be fleeing to means more than the place he would be leaving. Because Al–Arian and Hammoudeh have been prepared and willing to risk all, and may believe eventual deportation is a reality, I find by a preponderance of the evidence that I cannot reasonably set any condition or combination of conditions that will assure either Defendant's presence as required. In making this decision I have considered their pretrial incarceration could extend to two years with an anticipated trial length of six months to a year. Applying *El–Hage's* factors, I do not find the lengthy pretrial detention envisioned for these Defendants will violate their constitutional guarantees. The delay approximates *El–Hage's* pretrial delay, thirty to thirty-three months. Further, the government has not caused the delay, the charges are grave, and, as outlined above, the strength of the government's case against them is substantial.

### b. Fariz and Ballut

■ I find Fariz and Ballut have rebutted the presumption each is a flight risk. The incentive to flee, particularly given the quality of the government's evidence against them, is not as strong as to outweigh the substantial conditions of release each proposes. Both have strong ties keeping them here (Fariz has a wife and two children; Ballut and his wife have four children) and impressive support from family and friends willing to act as personal sureties. Further, the potential length of pretrial incarceration under these circumstances is difficult to justify. However, because I view the government's case against Fariz stronger than for Ballut, I find it appropriate to treat Fariz differently in setting his conditions of release.

### IV.

I find by clear and convincing evidence Defendants Al–Arian and Hammoudeh are dangers to others and the community and by a preponderance of the evidence each is a serious risk to flee. Furthermore, I conclude I cannot set any condition or combination of conditions for these Defendants that will reasonably assure their appearances and the safety of the community. Finally, as to Defendants Fariz and Ballut, I find the conditions of release set below will reasonably assure each's appearance and the safety of the community. Accordingly, it is

ORDERED:

1. Defendants Al–Arian and Hammoudeh are to be detained pending trial and are committed to the custody of the Attorney General for confinement in a correction facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

2. Both Defendants Al–Arian and Hammoudeh are to be afforded reasonable opportunity for private consultation with counsel;

3. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which either Defendants Al–Arian or Hammoudeh is confined shall deliver that Defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

4. As to Defendant Fariz, the following conditions are set for his release. If he satisfies these conditions, a separate order for his release will be issued. Moreover, this Court will consider any other conditions the government proposes.

 a. The posting of $500,000 in cash or property or any combination of the two. Any property posted as collat-

eral is to be accompanied by an agreement to forfeit property that includes evidence of ownership. Moreover, if property bonds are posted, the Defendant must supply some proof of the equity value of that property.

b. The posting of $500,000 in personal surety bonds by responsible sureties.

c. The Defendant is also to sign a personal appearance bond (unsecured) in the amount of $100,000.

d. Supervision by Pretrial Services and reporting to that agency as directed and when directed.

e. The Defendant is to refrain from any fund-raising unless specifically authorized by Pretrial Services.

f. The Defendant is to maintain verifiable employment.

g. Travel is restricted to the Middle District of Florida.

h. The Defendant is to surrender any passport or travel documents he possesses.

5. As to Defendant Ballut, the following conditions are set for his release. If he satisfies these conditions, a separate order for his release will be issued. Moreover, this Court will consider any other conditions the government proposes.

a. The posting of $250,000 in cash or property or any combination of the two. Any property posted as collateral is to be accompanied by an agreement to forfeit property that includes evidence of ownership. Moreover, if property bonds are posted, the Defendant must supply some proof of the equity value of that property.[30]

b. The posting of $270,000 in personal surety bonds by responsible sureties.

c. The Defendant is also to sign a personal appearance bond (unsecured) in the amount of $100,000.

d. Supervision by Pretrial Services and reporting to that agency as directed and when directed.

e. The Defendant is to refrain from any fund-raising unless specifically authorized by Pretrial Services.

f. The Defendant is to maintain verifiable employment.

g. Travel is restricted to the Middle District of Florida.[31]

h. The Defendant is to surrender any passport or travel documents he possesses.

---

**30.** This Court, for the reasons stated by the government in doc. 53, will not accept as collateral the property belonging to the Chicago Islamic Center.

**31.** Ballut indicated at the detention hearing he would be willing to reside in this district. If he is unable to meet this demand, he must make application to the Court.